THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs* HALDANE CLEMINSON, Plaintiff in Error.

*Opinion filed April 19, 1911—Rehearing denied June 7, 1911.*

1. CRIMINAL LAW—*trial of criminal case should be confined to the issue.*  A criminal trial is instituted for the purpose of ascertaining whether the accused is guilty of the offense charged, and the evidence should be confined to that issue.

2. SAME—*evidence tending only to show that defendant is immoral is not competent.*  In a murder trial, evidence tending only to show that the accused is an immoral man, and having no possible tendency to throw any light upon the issue in the case, is not competent.

3. SAME—*practice of court calling witness should be limited to proper cases.*  The practice of having the court call a witness in a criminal case whom a party desires to interrogate without vouching for his testimony, should not be extended to persons who were not eye-witnesses of the crime or who have no knowledge of the facts, and the cross-examination should not be allowed to go beyond the issue involved.

4. SAME—*it is prejudicial error for court to call witnesses and allow an unlimited and irrelevant cross-examination.*  It is prejudicial error for the court, at the request of the State's attorney, to call witnesses in a murder trial who have no knowledge of the facts, and, after asking a few questions, permit the State's attorney to conduct an exhaustive and irrelevant cross-examination bringing out matters of a nature very damaging to the character of the accused and throwing no light on the issue; and such error is ground for reversal if there is any room for reasonable doubt of the guilt of the accused under the competent evidence.

5. SAME—*when judgment will not be reversed though error in admitting evidence was flagrant.*  Error in the admission of evidence having no tendency to prove the crime charged but only to show that the accused was an immoral man and guilty of criminal practices in his profession is not ground for reversal, where the competent evidence in the record so conclusively establishes the guilt of the accused that there is no room for reasonable doubt.

6. The court reviews the evidence in this case at length, and holds that it excludes all reasonable hypothesis of the death of the defendant's wife from any cause other than chloroform, as well as all reasonable hypothesis that the chloroform was self-administered or administered by any person other than the defendant, and that it conclusively establishes his guilt.

COOKE and DUNN, JJ., and VICKERS, C. J., dissenting.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. WILLIAM H. McSURELY, Judge, presiding.

BURRES & McKINLEY, and E. J. GREEN, (ELIJAH N. ZOLINE, of counsel,) for plaintiff in error.

W. H. STEAD, Attorney General, and JOHN E. W. WAYMAN, State's Attorney, (JOHN E. NORTHUP, and WILLIAM E. RITTENHOUSE, of counsel,) for the People.

Mr. JUSTICE FARMER delivered the opinion of the court:

Plaintiff in error (who will hereafter be called defendant) was indicted in Cook county for the murder of his wife, Nora Jane Cleminson, in the city of Chicago, on the 30th day of May, 1909. The first, second, third, fifth, sixth and seventh counts of the indictment charged the defendant murdered his wife by administering chloroform to her, and the fourth charged the death was caused by administering a poison, the character of which was to the grand jurors unknown. Defendant pleaded not guilty, and after a trial lasting substantially a month the jury found him guilty of murder and fixed his punishment at imprisonment for life in the penitentiary. Motions for a new trial and in arrest of judgment were overruled and judgment rendered on the verdict. This writ of error is sued out by defendant to reverse the judgment of conviction.

Defendant was married to Nora Jane Morgan in Michigan on Thanksgiving day, 1903. At that time both parties resided with their parents on farms near South Haven, Michigan. Their first child was born in September, 1904. A few weeks after that event defendant went to Chicago to study medicine. Shortly afterwards his wife, his mother and father moved to Chicago, and the two families lived together about three years. Another son was born to defendant and his wife in June, 1906, and some time afterwards defendant, his wife and children moved into a flat

about eight blocks distant from the defendant's father and
mother.    Defendant was pursuing his medical studies and
assisting in supporting his family by working at different
kinds of employment.    Defendant's family and that of his
parents visited each other very often, and they usually had
their dinners together on Sundays at the home of defend-
ant's parents.    In August or September, 1908, defendant
and his wife moved to another flat about five blocks distant
from his parents' home.    Defendant graduated in medi-
cine in 1908, and in September of that year engaged in the
practice of his profession.    About five o'clock in the morn-
ing of May 30, 1909, the defendant telephoned Dr. Hull-
horst, who lived a few blocks distant, to come to his house.
Dr. Hullhorst testified the defendant said to him over the
telephone, "Come down to the house as soon as you can;
it looks as if an earthquake had struck the place; we have
been done up."    Dr. Hullhorst went at once, arriving at de-
fendant's house about ten minutes past five.    The door was
not fastened and the doctor walked in without knocking or
ringing the bell.    Dr. Hullhorst had attended defendant's
wife when she gave birth to her second child.    He testified
when he went in the house defendant was lying on the floor
in the dining room, dressed in pajamas and a bath robe.
He inquired of defendant what was the matter, and defend-
ant replied, "We have been done up; we have been robbed;
we have been chloroformed."    The doctor asked him where
his wife was.    He replied she was in the bed-room, and
said, "I don't know what is the matter with her; I believe
she is dead."    The doctor went to the bed-room and found
her body on the bed.    She was dead, cold and rigid, and
the doctor gave it as his opinion that she had been dead
four or five hours.    The doctor then went back in the room
where defendant was and informed him his wife was dead.
He asked defendant to tell him about it, and defendant said
he did not know how it happened; that he awoke in the
night and felt as if he had been sick and feverish all night;

that he touched his wife with his foot and found she was cold; that he then jumped out of bed and hardly knew what had happened since. The doctor testified he then examined defendant, felt his pulse and found it was accelerated, fast, strong and full. He had no fever and the doctor did not then prescribe anything for him. There were no indications that he had been chloroformed and the doctor found no receptacle containing chloroform. Deceased was lying on her left side on the front of the bed, near the edge. Her head was thrown back slightly and her mouth was open. The left hand was under her face and the right on her breast. Her legs were slightly flexed. On the back of the bed the covers were thrown back, and it appeared as if someone had occupied that part of the bed. The bed covers were over the body of the deceased up to the face but were not over the face. Half of a napkin was found under the face of the deceased and another half under the sheet at the back of the bed, next the wall. They were apparently parts of the same napkin. Dr. Hullhorst smelled both pieces but could detect no odor. On the sheet at the back of the bed was a dark-colored stain, but the doctor did not examine it carefully. He then talked again with defendant, who said, "This is tough," but that he could stand it if it were not for the boys. Defendant told the doctor if there was any occasion for an undertaker, to call Fred Roberts. The doctor replied it was not a case for the undertaker but for the coroner. He had previously notified the police station. Two police officers, Wood and Smith, arrived about six o'clock while Dr. Hullhorst was still at defendant's house. Shortly afterwards defendant's mother and his wife's sister, Miss Cecilia Morgan, who boarded with defendant's parents, came. Later Roberts, the undertaker, came, but the police officers would not allow him to go into the house and take charge of the body. Dr. Hullhorst further testified that when he entered defendant's residence he found the drawers had been taken out of the furniture and papers

and books scattered over the floor. In the dining room the drawers had been drawn out of the sideboard and linen scattered over the floor. In the bed-room the drawers had been taken out of the dresser and clothing scattered over the room. Defendant told the doctor they had been robbed of silverware and $40 or $50. Describing more fully defendant's condition when he found him lying on the floor, the doctor said he was gagging, trying to vomit, and crying, but he saw him vomit nothing but saliva. The doctor got him up and placed him on a couch. Afterwards he dressed. All the windows in the house were closed, except one, and that was open about an inch. The doctor gave it as his opinion the defendant was feigning the symptoms he manifested.

Policeman Wood testified he arrived at defendant's house about 5:45. He described how the drawers were pulled out of the furniture and their contents scattered over the floor and the jewelry case open and empty. He testified there were a great many half-burnt matches scattered over the floor in all the rooms. When he arrived defendant was lying on the floor, but he did not talk to him until after he had gone into the bed-room and viewed the body of deceased. He described her position the same as Dr. Hullhorst. He testified he then went back into the room where defendant was and asked him to tell what had occurred; that defendant replied, "You are a reporter and I will not talk with you," and turned his face away and gagged. He testified that he and his fellow-policeman made a systematic search of the house, and that they found footprints outside the house under the window of the bed-room where the body of Mrs. Cleminson lay. They then went into the house and procured defendant's left shoe and fitted it into the tracks that led up to the window. They then discovered that the track of the right foot was deeper than that of the left. They then procured the right shoe and placed it in the tracks and found that it fitted them exactly. They

examined the windows and screens to see if they had been forced open and found them intact, except one screen in the dining room window had been removed and was on the sidewalk. The witness then again asked defendant what had happened, and he replied,. "Somebody must have been in the house," and inquired where they got in. The witness replied he did not know, and defendant said they must have gotten in through the window because the screen was out. The witness asked defendant what he had that burglars could take and what was missing, and defendant said his wife's engagement diamond ring, his stick-pins, and $50 in money out of his pants pocket. Witness inquired where his pants were, and defendant pointed to a chair and said he left them on the chair the night before. The witness found the pants folded up behind the chair on the floor, also a small, black leather pocket-book lying open beside them on the floor. The silver spoons were found by witness and his fellow-policeman in the kitchen. When witness would ask defendant where the jewelry was kept he would reply that he was sick, and did not answer the inquiry. He continued to gag for a considerable time. His mother asked him to dress himself and he finally did so. He talked a great deal to himself, or apparently to no particular person, about burglars, and inquired why they came in there and killed such a sweet little woman when they were getting things in shape to enjoy life. At one time defendant went with his mother into the room where the body of his wife lay and said he wished they had got him instead of her. He told the witness that chloroform had been used and said he could taste it in his mouth. Dr. Hervey, who was an assistant of defendant, came after the witness had arrived and defendant asked him to call an undertaker. That was about half-past seven. Hervey did so, but the witness told him it was no use until the coroner came there. Hervey asked witness if he could go into the room and look at the body. Witness told him he could do so and went with him. Her-

vey touched the body with his hand and then drew out from
under the face a napkin. Froth was coming out of the
mouth of the body and the napkin was moist from it. Wit-
ness then stopped Hervey and called Dr. Hullhorst. The
doctor came in, opened the napkin, smelled of it, then raised
up the sheet, and another napkin, or part of one, dropped
out of its folds. The doctor smelled of that also and laid it
down again. The witness smelled both napkins but could
detect no odor. The two pieces of napkin found in the bed
were of the same pattern as another napkin found in some
soiled clothing in the children's bed-room. Witness asked
defendant if it was possible to kill anyone with a little cloth
like the napkin found in the bed, saturated with chloroform.
He said it was if the person were asleep and it were put
under the face and the bedclothes thrown over him so he
could not get air. He said if a person could get no air
chloroform would kill very quickly. A lieutenant and ser-
geant of police who came about this time had considerable
talk with defendant in the presence of witness, and he told
them it must have been about four hours after he had eaten
supper that he was chloroformed; that as a physician he
knew that his food had digested. He told them the same
story about the jewelry and money being taken, and also a
gold watch. The sergeant searched his trousers and found
the watch in his pocket. He asked defendant why he did
not call the police, and the defendant said he used his last
nickel in calling Dr. Hullhorst. Dr. Reinhardt, the cor-
oner's physician, came and took charge of the body, opened
it, removed and examined the brain and other organs, or
parts of them. Mrs. Cleminson was about eight months
advanced in pregnancy. Police officer Smith substantially
corroborated the testimony of Wood, except that he did
not hear all that Wood testified defendant said in the dif-
ferent conversations had with him.

Lieutenant Culnane testified he arrived at defendant's
house about 8:30 in the morning, in company with Ser-

geant O'Brien. Wood and Smith were there when he ar-
rived. He talked with the defendant, who claimed that
burglars had been in his house and robbed it. He asked
defendant why he didn't call the police station. Defend-
ant said he didn't have a nickel. The witness told him he
didn't need a nickel to call the police station, and defendant
said he tried to get the station but could not. Witness
asked him why he could not, and defendant made no reply.
Witness found deceased's diamond ring and defendant's
stick-pins in defendant's coat pocket, in a closet. Defendant
was taken by the police to the Alexian Brothers' Hospital
about four o'clock in the afternoon. Sergeant O'Brien tes-
tified that he asked defendant to give him a report of the
matter and inquired what time he went to bed. Defendant
said he went to bed about ten o'clock; that he was a heavy
sleeper and fell asleep very soon after retiring; that he
woke up about five o'clock in the morning, very sick at his
stomach, and called his wife and asked her to get up, as
he was very sick. She didn't answer, and he then reached
over his hand and touched her and found she was cold and
dead; that he then got up and telephoned Dr. Hullhorst.
At this point Dr. Hervey spoke to the witness and said
he wished the witness would not talk any further to defend-
ant, as he was very weak. Defendant said he was getting
chills, and got up and put his overcoat on over his bath
robe and laid down on the lounge. The witness described
the appearance of the house, and the drawers being pulled
out, substantially as the other witnesses had done. He tes-
tified to making a careful examination for evidence of the
house having been entered by burglars and found none.
The witness and Lieutenant Culnane searched the house for
chloroform. They found a number of bottles in a medicine
case, none of which was labeled chloroform and none of
which contained chloroform that they could detect by the
smell. All bottles found were put in a box and given to
an officer to take to the station.

Edward Strum, a police officer, testified he arrived at defendant's house about nine o'clock on the morning of the 30th of May. When he arrived Dr. Reinhardt, Roberts, the undertaker, and his assistant, Dr. Hervey, Lieutenant Culnane, Sergeant O'Brien and officers Smith and Wood were in the house, also defendant's mother. Witness testified he heard Roberts, the undertaker, ask defendant about arrangements for the funeral; that defendant said, "You know my circumstances as well as I do; my intention was to have her cremated;" that his mother heard him and said, "Oh! dear, that would never have been her wishes." Defendant then said, "All right, then; proceed." Witness testified he told defendant's mother he was a police officer, and she said, "This is awful," and defendant said, "Well, I understand this thoroughly; it is up to them to investigate and find the guilty party if they can." The witness accompanied defendant to the Alexian Brothers' Hospital, and testified that Dr. Rettig, of that hospital, after some examination and feeling of the pulse of defendant, said to him, "You, as a practicing physician, know what a time we have putting anyone under the influence of chloroform; the burglars, by spilling chloroform in that room, would hardly have done that; you would have to get a cloth or something and cover the face with it." Defendant made no reply. Witness said to defendant, "It seems they don't take much stock in the burglary and chloroform story." Defendant replied, "If it is not burglars I suppose it is up to me." Witness testified the doctors at the hospital proposed to pump out defendant's stomach; that he first objected but finally submitted to it. Witness testified he went out awhile and afterwards returned and asked defendant if he thought his wife would take anything without consulting or seeing him; that defendant said he didn't know what she might have done; that she had full knowledge of medicine. The witness then asked the defendant if he felt like talking to him about the matter. Defendant inquired if the

witness was a Mason, and on being informed he was not said he was sorry,—that if he were a Mason he might confide in him.

Frank A. Jernigan, a police officer, testified he was at defendant's house May 30, and described conditions and appearances in the house substantially the same as other witnesses had. He testified to finding or seeing in the house a hypodermic syringe and bottles containing drugs. Among the medicines found was a small case made by the Abbott Alkaloidal Company, with bottles in it. Defendant testified the bottles contained morphine alkaloidal tablets, strychnine alkaloidal tablets, and one other that he could not remember.

Dr. Brune, of the Alexian Brothers'. Hospital, testified he examined defendant and found his heart action rapid but no evidence of disease. Defendant had taken a number of drinks of liquor during the day and the witness testified he observed an alcoholic smell about him. He tested the urine and examined the contents of his stomach but found no evidence of chloroform. From the hospital defendant was removed to the Sheffield avenue police station.

George McGowan, a police officer of the Sheffield avenue station, testified that he, with other police officers, accompanied the defendant to the funeral, which occurred on June 1; that they visited defendant's father's house and that defendant there went in the bath room and washed and combed. Witness asked, "How did this thing happen, anyhow?" and defendant replied, "Officer, I could tell you, but I will explain everything afterwards." The witness testified that on their return to the station from the funeral the defendant said, "I didn't realize what I was up against or I should have told the truth." On arriving at the station defendant was locked up in a cell, and witness testified that about fifteen or twenty minutes afterwards he talked with defendant; that he asked him how he was feeling, and defendant said all right, but that there were better places.

The witness asked him why he didn't tell Capt. Kane how the matter happened; that it would be better for him to do so. Defendant replied he didn't know the captain well enough, but if the witness would get Clifton Woolridge he would talk with him. Defendant belonged to the same Masonic lodge that Woolridge belonged to. Witness testified that he notified Woolridge, and that Woolridge talked with defendant about eight o'clock the same evening. The witness testified that on June 4 he took defendant from the Sheffield avenue police station to the Rogers Park police station for the inquest and on the way asked defendant how his wife came to her death. Defendant said that on the evening before her death he took a hot bath and went to bed about ten o'clock; that he did not know what time his wife went to bed. He said she took chloroform.

William M. Parker, a police officer of the Sheffield avenue police station, testified he went to the cell of defendant on the night of May 31 and told him he would like to talk to him, but defendant said he did not want to talk,—that he had nothing to say. Witness next saw defendant the next night after he was taken from Capt. Kane's office back to his cell, and inquired of defendant how he felt. He testified defendant said he felt better. Witness informed him that Capt. Kane had said he (defendant) had told him all. Defendant said he had, and witness asked him what he told the captain. Defendant refused to state and told him to ask the captain. Witness said he would rather have defendant tell him, and defendant asked witness if he was a married man. Witness answered that he was, and defendant said, "Love, friendship and honor go a long way until children commence to come; well, things were that way in my family until children commenced to come and then it was different; things have not been, since children commenced to come, as they were prior to that." Witness then asked about the burglary story, and defendant said, "Oh! that was a fake; I made that up to save the honor of my

family and my children." Witness then asked how about the chloroform, and defendant said, "I made that up, too." Capt. Kane then came in and told witness to bring defendant up to his office. He did so, and Capt. Kane asked defendant if there was anything he thought of that his wife could have taken. He said there was a bottle of dope in the medicine cabinet that he had fixed up for a student in a hospital; that it had chloral and some other kinds of drugs in it. Defendant said after he fixed it up for the student he found out what he wanted to use it for and would not give it to him; that his wife might have taken that. He said he did not know the name of the student nor where he lived. The witness testified that on the morning of June 9 he was in Capt. Kane's office. Defendant was also there, and Capt. Kane asked him what he could do for him. Witness said the defendant replied that Capt. Kane could do him a favor that would do him a lot of good and do the captain no harm. Capt. Kane asked him what it was, and defendant said, "I want you to eliminate that part of my statement that I made to you about my wife's unfaithfulness." The captain said he could not do it, and the defendant replied he could if he wanted to. Capt. Kane said he could not do it and asked defendant if he wanted him to perjure himself, and defendant said then that he did not want anything more to do with the captain.

Clifton R. Woolridge, a police officer and the man defendant expressed a desire or willingness to talk to, testified he went to the police station where defendant was detained about eight o'clock the evening of June 1 and there first talked to Capt. Kane about ten minutes. Witness then went to the cell where defendant was and asked him if he wanted to talk with him (witness.) Defendant said he did. The cell was unlocked and witness and the defendant went to Capt. Kane's office. Witness testified he told defendant the police had made an investigation of the burglary charge and that there was nothing in it and advised defendant to tell

the truth and clear the matter up.   They talked at consid-
erable length, and defendant said he was innocent but that
the story about the burglary was not true.   He said his wife
attempted suicide about two weeks before her death but
that he discovered it and saved her.   He said that they were
not mated but that she was a good housekeeper; that he
told the burglary story to save the honor of his family.
Witness advised defendant to talk to Capt. Kane, and he
consented to do so.   Shortly afterwards Capt. Kane came
in and witness told him defendant had admitted the burg-
lary charge was not true, and the defendant then had a talk
with Capt. Kane.

Capt. Kane testified he was captain of the Sheffield ave-
nue police station; that on the night of May 31 he en-
deavored to talk with the defendant, but that the defendant
refused to talk and said he had been advised by his counsel
not to do so.   He declined to tell who his counsel was or
where his office was.   Witness next saw defendant about
ten o'clock on June 1 but had no talk with him.   After the
funeral he again saw defendant, with Woolridge, in the
office.   Witness left the room after having first talked with
Woolridge before defendant was brought into the office.
Woolridge and defendant were in the witness' office a little
more than an hour, during which time the witness heard
nothing that was said between them.   Afterwards Wool-
ridge called the witness in and said he pitied the defendant
and thought witness would when he heard his story.   He
started to tell the story, and defendant interrupted him by
asking him if he thought that was the proper thing to do.
Woolridge said he thought it was; that Capt. Kane was
in charge of the district and it was his duty to make a thor-
ough investigation, and he asked defendant to tell the cap-
tain what he had told him.   Defendant asked Woolridge
to tell the story, and in his presence Woolridge stated de-
fendant told him that he and his wife had not lived as man
and wife for over two years; that the unborn child she

was pregnant with was not his; that she had attempted, about two weeks before her death, to commit suicide on account of her shame, and defendant told the burglary story to save the honor of his children; that it was true defendant wanted his wife to get rid of the child, and said if she would do so he was willing to forgive her but he could not bear the thought of raising another man's child with his own boys. Witness asked defendant if that was true, and he said it was. Witness then asked defendant what was the origin of the trouble between him and his wife, and defendant replied he had been out all of one night taking care of persons who were injured in the Northwestern "L" road accident, and when he arrived home next morning, tired, sleepy and hungry, his wife asked him abruptly where he had been all night. He told her he was out with a lady friend. She said all right, if he was doing that kind of thing she could too. Defendant said he did not then believe she would do such a thing. He said he had no desire for sport; that his pleasure was with women; that he had a strong passion for them; that he and his wife were not mated; that their desires were not at all alike; that she was a good woman and a good housekeeper, but a man wanted something more than that. He said he was satisfied he had made a bad job of the burglary scheme. Defendant told witness not to say anything about what he had said about his wife. Witness then left for a short time, and when he returned the defendant was in his cell and several newspaper men were in the witness' office. Witness took them back to the cell house and told defendant they wanted to interview him on the burglary story. One of them asked him why he concocted that story, and he said to preserve the honor of his children. The reporter asked him what he meant by it, and he said, "I have told everything to Capt. Kane, and he can tell you if he wants to." They then asked the witness what he said, and witness told them to get defendant to tell the story. Later, the witness had de-

fendant brought to his office again, and asked him if there were any poisonous drugs in the medicine case that his wife could get hold of. He said he did not think there were, but there was a bottle of dope he put up for a student at Hahnemann Hospital, but on learning the student wanted it for knockout drops in saloons and bar-rooms he refused to give it to him. He said he didn't know the name of the student nor his address. The next morning witness again talked to defendant, and told him he was not satisfied with the statement defendant made to him and Woolridge the night before. Witness told defendant nothing he had said would aid him more than his wife's infidelity. Defendant said he didn't want that brought up; that he was sorry he had told Woolridge, and Woolridge had no right to mention it. Witness then went over some of the statements made the night before to witness and in the presence of the newspaper men, about defendant's relations with his wife, and stated that it seemed an unreasonable story and that he should do all he could to clear it up. Witness called defendant's attention to his previous statement about his passion for women and that although he had slept with his wife nearly every night they had had no sexual relations for two years, and told defendant the statement was unreasonable, to which defendant made no reply. Witness then asked the defendant how he accounted for his wife's death. He replied that about two weeks before her death her heavy breathing aroused him one night and he first thought she had taken morphine; that he got up and gave her strychnine in small quantities to make her vomit. Witness asked defendant if he understood him correctly to say he gave his wife strychnine in small quantities to make her vomit, and defendant replied he did; that he gave her hot water to drink and walked her around the room until she had recovered sufficiently to let her go to bed and go to sleep. Defendant said he talked with his wife next morning but she would not disclose what she had taken. He prescribed

nothing further for his wife. He said they had together drank a bottle of Pluto water the night before her death. Witness asked him whom he believed to be the father of the unborn child, and he said he was sure it was not his; that this was the reason he wanted his wife to get rid of it; that the thought of raising it with his own children almost wrecked his mind. Witness asked defendant if it affected his mind that way after he had agreed with his wife that she might go her way and he would go his, and inquired if she didn't have as much right to go outside as he had. He said yes, but he never thought she would do it. He said his wife had no life in her,—had no passion,—and would lie in bed like a log. Witness asked defendant if he slept with his wife the night before her death. He replied he did, and witness told him he didn't think he was telling the truth; that his story didn't sound reasonable, and again asked defendant if he slept with his wife the night before her death. Defendant said, "It is none of your damn business; I won't talk with you any more; you are trying to put a rope around my neck; I am through with you." Witness had another talk with defendant in his office June 9. Defendant was brought into the office and witness inquired what he could do for him. Defendant said witness could do him a favor that would do witness no harm and might do the defendant some good. Witness inquired what it was, and defendant asked him to eliminate all he had said about his wife's unfaithfulness in his conversation. Witness told the defendant he could not do so. Defendant replied he could if he wanted to. The witness said he could not without perjuring himself.

Dr. Fisher, defendant's partner in the medical practice, testified that defendant told him his wife knew that he was sometimes out in the company of ladies. Defendant said he was of a more active, passionate disposition than his wife, and that for that reason he was sometimes forced to

seek the company of other women and that his wife was aware of that fact.

Cecilia Morgan, a sister of the deceased, boarded at the home of defendant's parents and saw her sister every Sunday and frequently oftener than once a week. She last saw her sister alive on Saturday evening, May 29, between four and five o'clock, with her two children, at the defendant's mother's. She seemed perfectly well and took home with her a tomato plant, and witness saw it planted in defendant's back yard the following day when she went there after her sister's death. Witness testified her sister had for three or four weeks before her death been sewing on the wardrobe of her expected child. When the witness last saw her sister she was happy and cheerful. She never saw any manifestation of love and affection between her sister and defendant, but testified to occasions when she observed defendant treat his wife coldly and indifferently. They never went out together. Deceased took care of her children and did her own housework.

Hilda Morgan, another sister of deceased, last saw her alive on Wednesday before her death at the home of deceased, where witness took supper. Her health was good. Witness saw her on an average of once a week. About a month before her death defendant told witness as soon as he could afford it his wife could go her way and he would go his and she could have the children. Witness knew her sister was pregnant and had prepared a wardrobe for the expected child. Witness testified her sister was of a happy, cheerful frame of mind and disposition.

Mrs. Frank Bulow, a married sister of deceased, testified she saw deceased every two or three weeks the last year of her life, and that her health was good. The last time she saw her was about three weeks before her death. She testified about being at her sister's house on one occasion when the defendant treated his wife with coldness and indifference without any cause. Frank Bulow, husband of

the last witness mentioned, testified that in February before the death of defendant's wife he had a talk with defendant, in which defendant said the children were the only thing that kept him and his wife together. Witness testified that defendant's treatment of his wife was cold and indifferent.

Defendant testified in his own behalf, and said when his wife was about two months advanced in pregnancy he advised her to submit to an abortion, but she declined to do it; that she said she thought it was not right; that where there was life to destroy it would be murder. Defendant testified his reason for wanting to produce an abortion was for the benefit of his wife's health.

The proof shows defendant's mother was very kind and helpful to the deceased. She testified in behalf of defendant that his relations with his wife were pleasant and agreeable, but, proper foundation being laid therefor, she was contradicted by Cecilia Morgan and Mrs. Bulow, who testified Mrs. Cleminson said to them that she hoped the child with which deceased was pregnant would not be born alive; that with no more love than there was between defendant and his wife they ought not to have another child; that she had prayed so long that they would live, happily together she was almost ready to believe there was no God. Mrs. Bulow testified that on May 22 defendant's mother asked her to speak to defendant about treating his wife better. Frank Bulow testified that about a week before the death of defendant's wife his mother said she felt very sorry for the way her son treated his wife and asked him to speak to her son about it, and witness replied that it usually did more harm than good to interfere in family affairs. Mrs. Cleminson had previously denied making any of these statements. There were several other witnesses not referred to whose testimony, in a greater or less degree, corroborated the testimony of the witnesses whose names are mentioned.

Dr. Reinhardt, the coroner's physician, testified to the position and the appearance of the body when he arrived

at defendant's house, about 9:45 in the morning of May 30.
He testified that there was a stain on the sheet about the
size of his hand, of a greenish-brown color, that appeared
to be vomit.   Under the sheet was a pad which was not
soiled, but the mattress under the pad had a stain about the
same size as that on the sheet.   He examined the body and
found no injury of any kind.   He caused the body to be
placed on a board and straightened the limbs by force.   In
his opinion deceased had been dead from four to twelve
hours.   The body had attained its maximum degree of
stiffness.   The doctor opened the body by an incision from
the chin to the pubes, and described particularly how he
laid bare the organs of the body and the manner of con-
ducting the post-mortem examination.   The internal organs
from the lungs to the bladder were acutely congested,—
filled with blood.   He removed the brain and made an ex-
amination of all the vital organs and found no diseased
conditions.   Deceased was about eight months advanced in
pregnancy.   The fœtus was normal in every way and no
injury or violence had been done to any of the private
organs.   There was no irritation or redness of the face.
The doctor removed a portion of the lungs, the stomach,
with its contents, the heart, kidneys, spleen, and nine or
ten inches of intestine, to which was attached a part of the
duodenum next to the stomach.   They were placed in Ma-
son fruit jars found in defendant's house by his mother and
taken away by the doctor and by him delivered next day
to Dr. Haines and Prof. LeCount at Rush Medical College
laboratories.   The brain was taken to the undertaker's by
his assistant, where it was kept in a vessel containing for-
maldehyde and covered with absorbent cotton.

Drs. LeCount, Haines, Wesner and Webster testified to
examining the organs brought to the laboratory by Dr.
Reinhardt.   Some of them examined the organs micro-
scopically and others made chemical analyses.   Different
tests were used for the discovery of poison, and one, at

least, of the doctors making the chemical analysis subjected
the stomach contents to tests for the discovery of chloral
hydrate and morphine. No poison of any kind was found
in any of the organs except chloroform. In the stomach
there were found two and one-half grains of chloroform,
in the lungs two and one-half grains and in the brain
one and one-tenth grain, which would be equal to about
eighteen drops. These doctors were all qualified, by edu-
cation and experience, for making the examination of the
organs for poisons and for determining whether the organs
were in a healthy or diseased condition, and from the re-
sults of their examination to testify as experts as to what,
in their opinion, was the cause of death. Their testimony
is very voluminous, but it is only necessary to say that the
result of it was that they found chloroform in sufficient
quantities to produce death, and in their opinion the death
was the result of chloroform and not of any other poison
nor of any diseased or unhealthy condition of the organs.
It was also their opinion, from the appearance of the stom-
ach, that the chloroform was taken by inhalation. They
found no free globules in the stomach and no irritation that
would have resulted if the chloroform had been swallowed.
Dr. Moorehead, an expert anæsthetist, and one or more of
the other doctors referred to, testified that in their opin-
ion death could not have resulted from saturation of the
napkin placed under the face of deceased in the position
testified to by witnesses who saw it after her death.

The proof for the prosecution shows that the defendant
had little, if any, love and affection for his wife; that he
had relations with other women; that he tried to persuade
his wife to submit to an abortion, which she declined to do.
It also shows, satisfactorily, we think, that the death of
Mrs. Cleminson resulted from chloroform taken by inhala-
tion. There is no proof of any condition of mind or con-
duct of deceased that would lead to the suspicion of suicide
or that she ever manifested any suicidal tendency, except

the statement of defendant that he thought she attempted suicide about two weeks before her death. The testimony of other witnesses as to this illness of Mrs. Cleminson, her appearance and conduct, and recovery therefrom, and the actions and conduct of defendant immediately following it, was such, in our judgment, as to justify the jury in giving no credence to defendant's statements. The proof shows deceased was devotedly attached to her children; that she was an excellent mother; that she was not melancholy or despondent at the prospect of the coming of another child, and, except the statement of her husband referred to, there is no proof of any act or word of deceased to indicate that she was tired of life. The fact that the evening of the night she died she took from her mother-in-law's a tomato plant and planted it in her own back yard would seem to indicate she at that time entertained no thought of self-destruction. After defendant knew his wife was dead, according to his own story, he made elaborate preparations to corroborate the story invented by him that burglars had broken into the house, chloroformed himself and wife and robbed them of money, property and jewelry. After he had repeated the story of the burglary to a number of persons he was told the investigation made by the police discredited the burglary theory, and the property he said was stolen was found in the house, some of it in the places where it was usually kept and some of it where he had placed it in disarranging the house. He then repudiated the story of the burglary and said he concocted it to save the honor of his family. It was then he advanced the theory of suicide. After defendant had talked with Woolridge, who had been brought to the police station at the express desire of defendant to talk with him, defendant and Woolridge repeated to Capt. Kane the story defendant had told Woolridge when the two were together alone in Capt. Kane's office. According to the testimony of Kane, defendant said the child with which his wife was pregnant was not his and he at-

tributed her suicide to her shame.  He stated he had said to his wife if she would submit to getting rid of the child by an abortion he would continue to live with her, and he said the thought of raising another man's child with his own almost drove him wild.  When Capt. Kane expressed surprise at the defendant's mental condition over his wife's conduct after he had told her, as he said he had, that he had been out with a woman and gave his consent to her doing the same thing with men, defendant said he didn't believe she would do it.  Capt. Kane testified, and in this he was corroborated by Parker, that subsequently defendant asked him to keep secret what he had said about his wife's unfaithfulness.  Defendant testified in his own behalf and denied his guilt.  He denied making any statement about his wife's unfaithfulness, but the testimony in the record of his statements and conduct following the death of his wife fully warranted the jury in regarding the defendant as unworthy of belief.

Many errors are assigned as grounds for a reversal of the judgment.  Some of them are technical and not of sufficient importance, in our judgment, to justify a reference to or a discussion of them.  Some of the errors are sufficient to deserve notice, but we regard them as not well assigned.

It is very strongly argued that the post-mortem was not a complete medico-legal post-mortem, and did not show, beyond a reasonable doubt, that the death did not result from other causes than chloroform.  It is urged that there was only a superficial examination of the pancreas and glottis, which were not removed from the body, and no examination was made of the spinal cord, blood or urine. The small brain, or cerebellum, was not in the vessel containing the brain that was turned over to the doctors for examination.  Doctors qualified by education and experience testified on behalf of the defendant that a complete medico-legal post-mortem would require the removal and micro-

scopic or chemical examination of the cerebellum, pancreas, glottis, spinal cord, blood and urine; that there were several causes of sudden death, among which they mentioned edema of the brain, rupture of a blood vessel in some part of the brain, edema of the larynx and acute hemorrhagic pancreatitis. Dr. Reinhardt testified that he examined the pancreas without removing it, and that he examined the glottis also with his fingers and found no evidence whatever of any disease or any condition that was unhealthy. We think the proof shows that the post-mortem was made with sufficient thoroughness to establish the fact that the death of Mrs. Cleminson resulted from chloroform and not from any of the other causes mentioned which may sometimes result in sudden death. Conceding that the post-mortem was not as thorough as it was possible to make, it was sufficiently thorough under the circumstances of the case. At the outset the doctor and others were told by defendant that his wife had been chloroformed. There was no indication of violence. None of the organs indicated any diseased or unhealthy condition or any condition from which death might have resulted. Defendant had given the information that chloroform had been used, and this was confirmed by the tests made by competent persons of the brain, stomach contents and lungs. In those parts, alone, was found a sufficient quantity of chloroform to sometimes produce death. But the amount found in those organs could not have been all the chloroform that was taken, for all the medical proof shows that the drug diffuses itself quickly throughout the entire body, and that to determine the exact amount of it in a body it would be necessary to grind up the entire body, bones and all, and thoroughly mix the mass before examination. It is true, the medical testimony shows that ordinarily it is difficult to anæsthetize a person while asleep, but it also shows it to be quite as difficult, or more so, for a person to anæsthetize himself by inhaling chloroform. The evidence ex-

cludes all reasonable hypothesis of death from any other cause than chloroform, and we think also excludes any reasonable hypothesis of it having been self-administered. No one was in the house during the evening and night preceding May 30 except defendant, his wife and two little boys.

We find no substantial error in the rulings of the court in the admission of expert testimony of medical witnesses. There was error, however, of a very grave and substantial character in other respects in the admission of testimony. At the request of counsel for the State, and over the objection and exception of counsel for defendant, the court called and examined as its witnesses, before the prosecution rested, Anna Kolb, George Brand and Clifton R. Woolridge. The record shows counsel for the prosecution gave as the reason for this request as to the witness Anna Kolb that the State did not wish to vouch for the truth of all she would testify to and desired the privilege of cross-examining her. The same reason was given as to the witness George Brand, and as to him it was further stated by counsel that he was in the employ of defendant, and the State did not know until after the trial had begun what he knew about the case. As to the witness Woolridge, the only statement made by counsel was that the State desired to cross-examine him. The names of Anna Kolb and Brand were not on the indictment but the name of Woolridge was.

In *Carle* v. *People,* 200 Ill. 494, which was a murder case, the court, at the request of counsel for the State, called a witness who was present at the time of the homicide. Counsel based the request upon the ground that the witness was present when the homicide was committed and ought to be called, but counsel stated he did not wish to vouch for the truth of his testimony. The witness was called to the stand and examined by the court and cross-examined by counsel for the prosecution and the defense.

The principal objection made by the defendant in that case appears to have been to the statement made by counsel for the prosecution as the reason why he desired the court to call the witness. This court said (p. 504): "Where the State's attorney knows that a witness was present at the scene of the killing, but for some reason, either because he has no confidence in the witness or for any other reason, he may doubt his veracity or integrity, he is not obliged to call such witness. In such case the court may call the witness and leave him open for cross-examination by either side. The State's attorney is invested with a certain discretion in the matter of calling witnesses for the State. Inasmuch as the court made it necessary for the State's attorney to announce the ground upon which he exercised his discretion, the statement that the People would not vouch for the testimony of the witness or guarantee its truth was not improper and was not a challenge of the truth or veracity of the witness."

The witnesses Anna Kolb and Brand did not come within the rule laid down in the above case. They were not eye-witnesses to the homicide and it was not pretended that they knew the facts about the death of Mrs. Cleminson. After a brief examination of Anna Kolb by the court, in which she stated she became acquainted with the defendant in August, 1907, and met him on different occasions after that, and that he treated her in May, 1909, for two weeks when she was sick in a hospital, the State was permitted to give her a most searching and extended cross-examination, much of which related to matters that could have no possible tendency to throw any light upon the guilt or innocence of the accused. The witness' testimony showed that there was for some time, at least, after she became acquainted with defendant, a degree of intimacy between them that is unusual between a married man and an unmarried woman, although there was no proof of criminal

intimacy between them. The cross-examination tended to degrade the witness, and on account of the friendly relations that had existed between her and defendant would necessarily prejudice him. The witness had been in the State's attorney's office on more than one occasion, had been questioned extensively about her relations with defendant, and the questions asked of and answers made by her were taken down by a stenographer. A great many that were read to her on cross-examination were irrelevant to the issue involved, and she was asked if the questions were not asked her and if she did not make the answers read. The witness testified she was engaged to be married to a man by the name of Fowler, and counsel for the State asked her if she was not present in the State's attorney's office when a woman claiming to be Fowler's wife was also present, and if certain questions were not asked of the woman claiming to be Mrs. Fowler about her marriage to Fowler and about their living together, and if she did not make certain answers thereto. Before the trial the witness was sent to the Lexington Hotel by the State's attorney's office and while there was under surveillance of detectives from that office. Counsel for the State asked her if Fowler did not stay all night at the hotel one night while she was there, and the witness answered that he did. For the purpose of impeaching the witness counsel was permitted to inquire of her if she did not make certain statements to a Mrs. Morey, Mrs. Raymond and Mr. Faupel. The witness denied making such statements, and in rebuttal counsel for the State was permitted to call the witnesses named and impeach the witness Anna Kolb by proving that she did make said statements. The witness was asked if she did not on one occasion tell Mrs. Morey she was then Mrs. Cleminson, and if she did not at another time tell her defendant had performed two abortions upon her. The witness denied making the statements and Mrs. Morey testi-

fied she did make them. Witness was also asked if she did not on one occasion tell Mrs. Raymond that defendant had performed two abortions on her. She denied it, and Mrs. Raymond was permitted to be called and testified that she did make the statements. George Brand, called by the court, testified, in answer to inquiries made by the court, that he was twenty-three years old and was a medical student; that he had known defendant for a year and at the time of the death of Mrs. Cleminson was an assistant in the office of Dr. Fisher and defendant; that he slept on a couch or davenport in the reception room of the office. On cross-examination he was permitted to testify that in May he sterilized a forceps, curette and dilater at defendant's request; that a lady came to the office and remained a short time and left with defendant in a taxicab. The witness testified he had a suit-case in the office, and that after this occurrence the suit-case had a notice on it, "Don't open." There is no pretense that the lady referred to by the witness was Anna Kolb. In many other respects, not necessary to refer to particularly, the cross-examination of these two witnesses, even if they had been called by the defense, went beyond all reasonable bounds. The practice of the court calling a witness at the request of either party in the trial of a criminal case should not be extended beyond the limits of the rule announced in *Carle* v. *People, supra,* and when the circumstances justify a court in calling a witness the cross-examination should be limited to the issues involved and kept within proper bounds.

The witness Woolridge was a friend of defendant and is the first person to whom defendant admitted the untruthfulness of the burglary story. His being called by the court and cross-examined by the State was not so flagrantly erroneous as was the case of the witnesses Anna Kolb and Brand. His testimony showed him to be friendly to defendant and apparently desirous of doing him as little harm as possible, and he pretended to be unable to remember any-

thing more than the merest outlines of the conversation he had with defendant when defendant admitted the burglary story was untrue and of the conversation Capt. Kane had with the defendant in his presence. If the prosecution had put him on the stand his apparent friendliness to defendant and frequent lapses of memory were such that the court would have been justified in permitting, and undoubtedly would have permitted, the prosecution to ask him leading questions. No greater harm resulted to defendant or benefit to the prosecution than would have been the case if Woolridge had been called to testify by the prosecution in the regular and approved method of trying criminal cases. The same cannot be said of calling the witnesses Anna Kolb and Brand by the court, allowing the cross-examination of them that was permitted and the impeachment of Anna Kolb upon the points mentioned. This was palpably erroneous, and would not only justify, but would require, the reversal of a judgment in any case if there was any doubt whatever about the guilt of the accused. Policeman Jernigan was permitted to testify that he and Lieutenant Culnane found in defendant's house a pocket-book in which was a "cundum," and it was permitted to be exhibited to the jury. This was palpable error, without any circumstance whatever to justify it. Criminal trials are instituted for the purpose of ascertaining whether the accused is guilty of the offense charged and the evidence should be confined to that issue. A defendant may be a bad and immoral man generally and his friends and associates may not be persons of admirable character but yet he may not be guilty of a particular crime charged. Whether defendant produced abortions on Anna Kolb and another woman could shed no possible light upon the issue whether on the night of May 29 he murdered his wife by administering to her chloroform. The same is true of the cross-examination of Anna Kolb for the purpose of showing that she was not an admirable character. It was not

improper for the prosecution to show the relations and feelings of the defendant toward his wife, and, if it were true, that he had an affinity to whom he was much attached, but the cross-examination of Anna Kolb was not directed to that purpose.

We also feel it our duty to say that the record shows one of counsel for the State addressed certain remarks to one of counsel for the defense that deserved severe rebuke from the court, but no rebuke was administered. Such conduct should not occur on any trial, and lawyers owe it to their profession and to the courts to avoid language and conduct the only effect of which is to destroy respect for the profession and for the courts.

The condition of this record is such that we have given its consideration much time and very serious thought. The competent evidence in the record, in our judgment, leaves no room for the slightest doubt of defendant's guilt. If this were not so, our duty to reverse this judgment would be most clear. The question then arises, in a case where the competent proof in the record shows the guilt of the accused beyond any doubt but where the record also shows errors of so grave a character as those before referred to,—errors that would require the reversal of a judgment in a case where the evidence left room for doubt of the guilt of the accused,—whether it is the duty of this court to reverse the judgment or to affirm it on the ground that the guilt of the defendant was so conclusively established by competent proof that the judgment should be affirmed notwithstanding the errors committed. After much deliberation we have concluded that as we cannot say that upon the competent evidence there might be a doubt as to defendant's guilt, we would not be justified in reversing the judgment on account of the errors committed. *Wallace* v. *People,* 159 Ill. 446; *Jennings* v. *People,* 189 id. 320; *Barber* v. *People,* 203 id. 543; *Wistrand* v. *People,* 218 id. 323.

Without further adverting to the testimony, which we have above set out in part, only, it is sufficient to say that we have read it all with great care, and cannot escape the conclusion that the verdict could not have been otherwise than guilty even if none of the errors referred to had been committed.

Complaint is made of the rulings of the court in giving instructions for the People and refusing instructions asked by the defense. One, at least, of the instructions given for the People was not strictly accurate, but we find no such error, either in giving or refusing instructions, as would justify a reversal of the case even if the proof were less conclusive than it is.

We have given the case the best consideration we are capable of. Some errors slighter in character than those referred to were undoubtedly committed during the progress of the trial, but this is almost unavoidable in the trial of a case lasting, as this one did, a month. Our conclusion is that the verdict was correct, and the judgment is affirmed.                    *Judgment affirmed.*

COOKE and DUNN, JJ., and VICKERS, C. J., dissenting:

It is only under extraordinary circumstances that it becomes proper for the trial judge to call and examine a witness. It should never be done upon the mere request or suggestion of a party. If either party desires such action to be taken a showing should be made sufficient to convince the court that the ends of justice would be defeated if it were not done. In this case no such showing was made or attempted and the calling and examining of witnesses by the court was wholly unjustified. The cross-examination by the State's attorney of the witnesses so called was highly improper. While the evidence tending to prove the guilt of the defendant was strong, the error on the part of the court in calling and examining the three witnesses named, and in

permitting the State's attorney to cross-examine them in a manner grossly improper, is so grave and prejudicial that we are of the opinion the judgment should be reversed and the cause remanded for a new trial.