(Nos. 22789, 22864,

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ROGER TOUHY *et al.* Plaintiffs in Error.

*Opinion filed June 14, 1935—Rehearing denied October 2, 1935.*

WM. SCOTT STEWART, for plaintiffs in error.

OTTO KERNER, Attorney General, THOMAS J. COURTNEY, State's Attorney, and J. J. NEIGER, (WILBERT F. CROWLEY, EDWARD E. WILSON, HENRY E. SEYFARTH, JOHN T. GALLAGHER, and MARSHALL V. KEARNEY, of counsel,) for the People.

Mr. JUSTICE JONES delivered the opinion of the court:

Roger Touhy, Peter Stevens, Albert Kator, Hugh Basil Banghart, Edward McFadden, William Sharkey and Charles Connors were indicted in the criminal court of Cook county upon a charge of kidnapping John Factor for ransom. Touhy, Stevens, Kator and McFadden were tried before Judge Feinberg. At the close of the evidence a *nolle* was entered as to McFadden. The jury did not agree upon a verdict and was discharged. On a second trial the plaintiffs in error were found guilty. Banghart was tried separately before Judge Steffen and found guilty. Each of the verdicts fixed the penalty at ninety-nine years in the penitentiary. Judgments were entered on the respective verdicts and writs of error sued out as to each. The causes were consolidated in this court, but later, upon Banghart's application, the consolidation was vacated and the writ of error in his case was dismissed. Sharkey and Connors are dead. Stevens is often referred to in the testimony as Gus Schafer. Banghart frequently went by the name of Larry Green. None of the defendants testified on the trial.

John Factor testified he was kidnapped on the night of June 30, 1933, while leaving the "Dells," a road-house in the northwest part of Cook county. His party consisted of his wife, his son Jerome, his brother-in-law, Harold Cohn, Mr. and Mrs. Epstein and their son, Mr. and Mrs. Hyman and their daughter Catherine, and Charles Redlick. They started for their homes about 1:00 o'clock A. M., leaving in three cars. One of the cars was driven by Jerome Factor, with Epstein and John Factor as passengers. About a block and a half east of the Dells three cars containing about a dozen armed men approached the Factor car and forced it to the curb. Members of the Factor party who were following came up, and they were compelled to get out of their cars and line up along the roadway. Factor and Epstein were taken out of the car in which they were riding and put into a car of the kidnappers and were blindfolded. After going a short distance this car turned to the right and Epstein was allowed to go. Factor was kept that night and the next day in the basement of a house called the "Glenview house." The next night he was taken to a farm house and kept there until July 12, when he was released upon a payment of a large ransom.

The evidence for the People shows that while Factor was in the basement at the Glenview house one of the men removed the handkerchief blindfold and replaced it with adhesive tape. Factor got a look at a man standing opposite him and identified him as Kator. At the farm house he recognized Banghart by his voice. Factor was directed to write a letter to his wife and the blindfold was removed. While he was writing the letter two men stood in front of the table with a blanket partly concealing them. He identified one of them as Roger Touhy. On the night before his release they told him his wife had $70,000 and asked if he could get $50,000 more provided they would release him. He agreed to get it in about a week or ten days. They talked over the method of sending the money, and

arrangements were made to have Costner, one of the kidnappers, telephone Factor about it. Factor did not know Costner's name at that time but afterwards learned it in Baltimore. He identified Schafer and Sharkey as two of the men who captured him on Dempster street. After his release he received five or six telephone calls in reference to the balance of the ransom money. At one of the conversations arrangements were made for him to pay $15,000. Prior to that he had talked to Capt. Gilbert, of the police, and two agents of the department of justice. They were always present with Factor during the telephone conversations. At the last telephone conversation it was agreed that the $15,000 should be sent by a messenger boy in a Checker cab. By arrangement with the authorities a dummy package was made up with $500 and given to two officers, one of whom was disguised as a Western Union messenger boy and the other as a taxi driver. They drove to an appointed place in Willow Springs and delivered the package to Banghart and Connors.

In August, after Factor was released, Capt. Gilbert showed him a picture of Kator and told him he was an associate of Roger Touhy. Factor stated that it was the picture of the man he saw in the basement. In November he saw Kator after he was in custody. Factor identified the Glenview house as the house in the basement of which he was first held. He testified he was able to identify Touhy, Kator, Costner and Banghart by their voices.

Jerome Factor identified a picture of Sharkey as one of the kidnappers. Mrs. Factor also identified it. Epstein and wife were unable to identify any of the kidnappers. James Reddick, Epstein's chauffeur, testified that he got a good look at one man's face and could recognize him but had never seen the man since. He saw him about 10:00 o'clock that night at the Dells leaning against a car with a machine gun and concluded he was one of the guards. He did not identify any of the other men. As he started out

of the Dells yard with his party a car tried to beat him out. It was the car that cut Factor's car off.

Isaac Costner testified, in substance, that he came to Illinois from Tennessee between the 25th and 28th of June. He went to Park Ridge, Illinois, to see Basil Banghart, whom he had known five or six years, and stayed with him that night. He knew, or became acquainted with, Touhy and his associates. He, Connors, Banghart, Touhy, Gus Schafer and Kator frequented Jim Wagner's saloon. "The Touhy outfit" had two or three places to live. On the night of June 30 he was in one of their places. After he had gone to bed, three or four men, including Banghart, woke him up about 11 :00 o'clock and said they wanted to grab Factor. He went with them to the Dells. They had three cars. He, Connors, Touhy, Schafer, (Stevens,) Sharkey, Banghart, Kator, Porkey Dillon, and some others whom he did not remember, were there. They parked their cars northwest of the Dells, on the roadway. A man who Banghart said was Silvers came out and reported on Factor. They stayed there some time, then drove out and parked their cars on the right side of Austin avenue, facing Dempster street. The same man again came over and described Factor and the car he would be in. When Factor and Epstein were captured Costner helped put them in one of the cars. Touhy and either Connors or Sharkey were in the back seat. When they took Factor into the house Costner stayed in the automobile. He slept at one of the Touhy houses that night. The next day he stayed with Factor in the basement of the house where the latter was confined. Two to four of the others were there, coming and going. About 10 :00 o'clock that night they left in three cars, taking Factor along. Connors, Banghart, Touhy, Sharkey, Kator, Schafer, and some others whom he did not know, were there at that time. They went fifty or sixty miles and close to midnight arrived at a farm house, where Factor was put to bed in a room on the second floor. Costner

guarded him ten or twelve days. Banghart and Touhy were there three or four times. Schafer, Kator and Connors also came. In the presence of Banghart and Touhy, Factor wrote his wife that she should try to borrow up to $200,000, the price of his release. The men holding him were to get in touch with Dr. Soloway or Herman Garfield, with instructions how to deliver the money. Factor gave them his ring, his watch charm and wrist-watch as tokens to be delivered as proof that he was being held by those who were seeking ransom. After considerable negotiation $70,000 was paid and Factor agreed to pay $50,000 more for his release. Costner was to call him within two weeks. Factor was freed that night at LaGrange. The next day Banghart gave Costner $2400 in twenty-dollar bills and told him that was his share of the Factor money. According to the previous arrangement Costner called Factor at two or three places on different occasions demanding the additional payment. Factor claimed it was difficult to get the money and this conversation was reported back. On August 14 Factor agreed to pay $15,000 that afternoon at a place near the New York Golf Club, on the West Side, but did not do so. After three or four days Costner went to Tennessee and Banghart followed later. Then they went to Baltimore and lived there for a while. Costner was arrested on charges of robbery. Factor, learning of the arrest, went to Baltimore with a police officer. To the authorities in Baltimore Costner denied knowing anything of the kidnapping of Factor, but on being returned to Chicago he admitted his guilt and testified that the prosecuting attorney told him he would get some consideration for his testimony.

Walter Henrichsen testified that he rented the Glenview house at Touhy's direction. Prior to June 30 he was a guard in Touhy's yard at a salary of $40 a week. He did not go to work on July 1 or 2 and did not see Touhy from June 30 to July 4. He first met Costner the latter

part of June, and saw him once or twice in July with Banghart in Wagner's basement, near Touhy's home. He also testified to several meetings of Touhy and his associates and armed trips at night with them. On July 5 and 6, at Touhy's direction, he picked Silvers up at the Dells and took him to the Commercial Club, where conferences were had with the defendants and some other associates. On July 12, about 12:30 or 1:00 o'clock, he and Jimmy Tribbles, accompanied by three other cars, drove to Twenty-second street, near Wolf road, to collect the ransom for Factor. As he remembered, Dillon drove one car, Kator drove another and Sharkey drove the one he was in. They met a man there who he believed was Dr. Soloway and received a suit-case from him containing the ransom. Tribbles had a machine gun and a pistol. They then went back to the Glenview house. He got out and brought Touhy over, telling him of the trip to Twenty-second street. Tribbles took the suit-case into the house. Schafer, Banghart, Kator, Sharkey, Dillon, Connors, and another fellow that he did not know, were there. That night he and Sharkey were out together until about 1:00 o'clock. Sharkey was drinking heavily. The next day, Kator, Schafer, Connors, Tom Burns, Eddie McFadden, Tribbles and Touhy were at Dillon's place all day, drinking beer. On July 14, at Dillon's, Touhy gave him $1000 in ten and twenty-dollar bills and told him he could buy a new car. At the first trial he testified that he had no idea the $1000 could possibly be any part of the ransom money and did not tell anything about going out with Tribbles and Sharkey to get the suit-case and did not mention Costner. He explained that he did not then know Costner's name and was trying to shield himself. It was not unusual for him to get money from Touhy to buy a car, and he had bought a number of them in the same way.

James Wagner testified that in May, 1933, he was in the road-house business about two and one-half miles north

of DesPlaines on River road, about six hundred feet south of where Touhy lived. Prior to that he had worked about six years for Touhy, driving a beer truck. Touhy and his associates frequented his place of business. On the afternoon of June 30, Kator, Touhy, Henrichsen, Schafer, Sharkey, Dillon, Connors and Banghart were there. They came in about 3:00 o'clock and stayed until about 6:30. Henrichsen left about 6:00, came back about 7:30 and was still there at midnight. None of the others came back that night. On June 30 they talked in his presence, but he heard nothing about a plan to kidnap Factor.

Adeline Wagner, wife of James Wagner, testified she saw Touhy, Schafer, Kator, Sharkey and McFadden leave her husband's place of business about 6:30 or a quarter to 7:00 o'clock on June 30. They left in about three cars.

Herman J. Garfield testified that on July 2 his telephone rang and somebody on the line said he was speaking for Factor, and asked him to convey a message to Mrs. Factor demanding $200,000. Dr. Soloway, who lived at the Copeland Hotel, testified to a like communication.

Rudy Benitez, a bell-boy at the Copeland Hotel, testified that on July 9, 1933, he received an envelope from a man whom he identified as Sharkey, with directions to deliver it to Dr. Soloway and said there was no answer. The envelope contained something round inside. He delivered it at Dr. Soloway's door. On cross-examination he testified that he did not say at the former trial that Purvis told him he was going to show him the man that delivered the ring. Helen Kaylor, a court reporter, testified that he did make such a statement.

Dr. Soloway testified that after several telephone communications on different days with the party demanding the ransom, it was agreed that he should deliver the $70,000. He followed directions, and on July 12 drove out Jackson boulevard to DesPlaines road, turned left to Twenty-second street and drove slowly to the right. A little car came up

and one of the two men in it handed him a watch charm that belonged to Factor. The man had a machine gun in his lap and an automatic gun in his right hand. Dr. Soloway delivered the money and was told that Factor would be released about 9:00 or 9:30 that night. He did not identify anybody with whom he communicated.

Edward McFadden, as to whom a *nolle prosequi* was entered, testified that he knew all of the defendants and was frequently at Touhy's house in Glenview but that he never saw Costner in his life before the trial, and that he and Tribbles were in the Oak Park Hospital from the last Thursday in June until the second Saturday in July. He went to live at the Glenview house about the 15th or 16th of June. His son, Andrew McFadden, lived there. Neither Schafer nor Touhy came there.

Basil Banghart testified that he had been around Chicago from the latter part of June until the first part of July, 1933. During that time he did not see Costner, but that Costner came to his house in Park Ridge on July 19, 1933. He denied taking any part in the kidnapping of Factor or collecting the ransom money from Dr. Soloway. He was in Wagner's saloon a number of times but Costner was not there. He fixed the date that Costner arrived in Chicago by reading in the paper the next morning about the arrest of Touhy and the men who were with him. In the early part of the evening of June 30 he was in Wagner's place. Touhy, Kator, Schafer and Henrichsen were there. He thought Dillon was there. Connors and Tribbles were in a hospital, guarding Tommy Touhy. At 10:00 or 11:00 o'clock he went home. The next morning he woke up rather late, when Costner came in the house. The witness corrected himself by saying he made a slip when he said Costner woke him up, for Costner was not there on July 1. He did not give Costner $2400, and did not get any money along about that time but lived on the money he got by stealing. On the evening of July 19 Costner unfolded a

scheme to "shake Factor down" for more money, and said that he had heard Factor was supposed to pay off more money. He told Costner he would not be interested. They had conversations for a week or more about it. Costner told him that Factor was willing to pay off. They later met Factor, who told them he wanted to convince the government authorities and the crown attorneys that he had been kidnapped. He was to give $50,000 to "make it look good." It was to be divided between Connors, Costner and Banghart. Costner received $5000 that day. Banghart made subsequent calls to Factor on the phone, and it was arranged that the money was to be delivered by two government men at Willow Springs. Costner told them the money would be brought to the place of contact in a cab by a Western Union messenger boy. Banghart and Connors drove to the place of contact and a package was handed to Banghart. The package proved to be a dummy containing $500. A police trap had been arranged, but Banghart and Connors escaped from it. Banghart admitted that in the State's attorney's office, before the trial, he denied knowing Factor, Roger Touhy, Tommy Touhy, Connors, Schafer or Kator. Costner and Factor denied the meeting with Banghart, or any arrangement to send two friendly government men with $50,000 to make the kidnapping "look good."

Emily Ivins, a switch-board operator and a witness for the defense, testified she knew Mrs. Roger Touhy for fifteen years; that she lost her job on June 29 and the next day went out to the Touhy home, where she stayed until July 5. On the day she arrived she saw Touhy about 6:00 o'clock. He left right after dinner and returned about 11:00 or 11:30. They all sat on the front porch until they retired, about 4:00 o'clock in the morning. In rebuttal, Edward Schwabauer, a guard at Touhy's home, testified that on the night of June 30, 1933, he was in the yard all night, except about twenty minutes when he went

next door to Wagner's for some beer. He did not see Touhy or Emily Ivins at the Touhy place and did not see Touhy around there the next night.

The material evidence has been set forth at length in this opinion because one of the grounds for reversal is that the defendants were not proved guilty beyond a reasonable doubt. That contention will be hereafter considered.

The defendants' attorney filed an affidavit alleging, among other things, that on the first trial, when the jury retired to consider of their verdict, the judge orally instructed them that it was their duty to consult with their fellow-jurors and arrive at an agreement, if possible; that after they had been out for a considerable time he sent them a written questionnaire requesting information as to the probability of an agreement, and that after they had been out twenty-five hours he recalled them to the box and discharged them. It is claimed that the discharge of the jury was not with the consent of the defendants and that it does not appear the jury could not agree upon a verdict. The defendants therefore say they had been in jeopardy, and they seek to interpose that defense. The record recites: "Jury return into open court and report they disagree. Order of court jury discharged from further deliberation in this cause and mis-trial ordered." It is not claimed that the jury were recalled to the box without previously informing the court of the disagreement. A jury in a criminal case may be discharged without a verdict whenever in the court's opinion there is manifest necessity for the discharge or the ends of public justice require it. The exercise of that authority is within the sound discretion of the trial court and is not reviewable in the absence of abuse. Such abuse is not presumed by a court of review. (*People v. Simos,* 345 Ill. 226; *Dreyer v. People,* 188 id. 40.) The affidavit does not show any abuse of discretion.

An application for a change of venue from the trial judge was refused. The record shows that prior to the

first trial, the defendants, upon their petition, obtained a change of venue from Judge Miller, one of the judges of the criminal court to whom the cause had been assigned. Section 26 of the Venue act (Smith's Stat. 1933, chap. 146, par. 26,) provides that no more than one change of venue shall be granted to the defendant or defendants. While the statute allowing a change of venue should be interpreted so as not to defeat the rights conferred, (*People* v. *Scott,* 326 Ill. 327,) it cannot be so construed as to contravene its express provisions. Where the language of a statute is plain and unambiguous there is no room for construction and it must be given effect by the courts. (*Levinson* v. *Home Bank and Trust Co.* 337 Ill. 241; *Downs* v. *Curry,* 296 id. 277.) In *People* v. *McWilliams,* 350 Ill. 628, we held that upon a proper showing the defendant was entitled to a change of venue after a reversal of his conviction, but in that case there had been no prior change of venue. That holding is not applicable to the facts in this case.

An application was also made for a change of venue from the county on the ground that there exists a prejudice of the inhabitants against the defendants; that the first knowledge of such prejudice came to them on the day the application was made; that Factor had been fighting extradition to England, and that although the United States Supreme Court had affirmed an extradition order he has been able to remain out of custody; that one of the defenses to the kidnapping charge is that Factor was not, in fact, kidnapped but arranged the affair to interest public officials in keeping him in this country; that the services of certain public officials were enlisted to prevent his extradition; that the Chicago newspapers continually carry articles concerning their activities; that by the liberal use of money Factor has associated himself with powerful underworld characters known as the "syndicate," and has influenced certain Chicago newspapers to refrain from referring

to him as "Jake the Barber" and to refer to him as John Factor, wealthy speculator; that the newspapers have assumed the guilt of the defendants, and because of the natural prejudice against the crime of kidnapping have poisoned the minds of the inhabitants of the county against them; that a gang war existed in Cook county and the syndicate endeavored to exterminate Touhy and his associates by assassination, and that if the cause is transferred to another county the influence which might be exerted by Factor, the newspapers and the syndicate would not be so effective.

If it be accepted as a fact that the newspapers assumed the guilt of the defendants, the affidavit did not set out what was published or what were the activities of officials, or state any fact or facts which tend to show prejudice on the part of the inhabitants of the county. It is not claimed that Factor's alleged connection with the so-called syndicate or the alleged attempt to exterminate the defendants was ever brought to the notice of anybody in Cook county, nor is it to be assumed that the inhabitants are susceptible to the influence of the syndicate or of any group of gangsters. Whether or not prejudice exists in the minds of the inhabitants of a county is a question of fact, to be determined in the sound discretion of the trial judge. (*People* v. *Katz,* 356 Ill. 440; *People* v. *Cobb,* 343 id. 78.) No abuse of that discretion was shown.

Touhy, Stevens and McFadden filed a motion to suppress as evidence certain guns on the ground that they were illegally seized, in violation of their rights under the State and Federal constitutions prohibiting unreasonable searches and seizures. The guns, consisting of five pistols and revolvers and one rifle, were seized in Wisconsin on July 19, 1933, by officers of that State after Touhy, Stevens and McFadden were arrested for reckless driving and running their car into a telephone pole. The guns were taken from their car upon their arrest. The rule in this State is, that

where officers of the State charged with the prosecution of crime, conduct, by virtue of their office, an unlawful search and seizure, the evidence thereby obtained is not admissible against the defendant. (*People* v. *Castree,* 311 Ill. 392; *People* v. *Brocamp,* 307 id. 448.) The rule is not applied to evidence unlawfully obtained by others than State officers acting under color of authority from the State. (*People* v. *Castree, supra; People* v. *Paisley,* 288 Ill. 310; *Gindrat* v. *People,* 138 id. 103.) Likewise the provision of the Federal constitution against unlawful searches and seizures is not intended as a limitation upon other than governmental agencies. (*Burdeau* v. *McDowell,* 256 U. S. 465, 65 L. ed. 1048; *Weeks* v. *United States,* 232 id. 383, 58 L. ed. 652.) The seizure was not made or authorized by any officer of this State or by any Federal agency. The court did not err in denying the motion to suppress the evidence.

The first trial began January 17, 1934, and lasted until February 2. The new trial did not begin until February 13. The principal grounds urged for a continuance of the second trial were that counsel did not have adequate time for preparation, and that he had not been paid for his services in the first trial and time was needed for adjusting that matter. Pending the second trial the court appointed the same attorney to represent the defendants who represented them at the first trial and refused to permit him to decline the appointment. Manifestly, there was no basis for the claim of lack of time to prepare for the second trial. Moreover, the ability of counsel to arrange for his fees could not have been serious. Touhy was the owner of considerable property, including a large and valuable estate in Cook county. There was $2700 in custody of Federal officers which had not been identified as the proceeds of any crime, and this had been assigned to counsel by the defendants. Courts cannot be obliged to wait upon the payment of fees to counsel before bringing an accused to trial, otherwise

many miscarriages of justice would result. The defendants were in nowise prejudiced by denying the continuance.

It is claimed that Costner's testimony as to the payment of $2400 and the conversation about it with Banghart after Factor's release was incompetent, because a conversation out of the presence of the accused, after the termination of a conspiracy, is not admissible. The same claim is made as to the evidence of the police trap at Willow Springs, and it is pointed out that the defendants were then in custody on another charge. The evidence shows that the conspiracy had not terminated. It was a part of the agreement for release that $70,000 should be paid down and $50,000 more should be paid a week or ten days later. All the conspirators are deemed in law to be parties to all acts done by any of the other conspirators in furtherance of the common design. (*People* v. *Cohn,* 358 Ill. 326; *People* v. *Walinsky,* 300 id. 92.) The testimony was properly admitted.

Complaint is made by counsel for the defendants because he was not permitted to interrogate Costner in private prior to his going on the witness stand. Costner was brought from Baltimore to Chicago on February 17 and was called as a witness on the following Monday. Counsel suggested to the court that the name of the witness did not appear in the list given him by the State. The assistant State's attorney explained that when the case was called for trial Costner's whereabouts was unknown and the State was not then in possession of any definite information as to his connection with the case. Thereupon counsel for the defendants moved to withdraw a juror, and the motion was denied. Leave was asked for the defendants' counsel to examine the witness in private. The court offered to permit an examination provided it should be conducted in the presence of the assistant State's attorney or Capt. Gilbert. At the end of a colloquy over the matter counsel interrogated the witness in the outer chamber of the court

in the presence of Capt. Gilbert. No prejudice to the defendants appears to have resulted in the action of the court. In fact, we know of no rule which would authorize the court to compel a witness to be examined in private by counsel for either side of a case, especially in the absence of the consent of the witness, and it is not intimated that Costner was either desirous or willing to be interrogated out of the presence of the court. There was no error in permitting the witness to testify. *People* v. *Scott,* 261 Ill. 165.

Clara Sczech was called by the court at the request of the People and testified that she was employed at the Glenview house by Henrichsen to cook one meal a day and strighten up after supper. Andy McFadden, Sharkey and Tribbles lived there. Kator, Eddie McFadden and Banghart frequented the place. She admitted making a sworn statement on October 26, 1933, that she had seen Touhy, Connors and Schafer there, but testified she was so nervous she did not know what to do and made mistakes in her statement. She said she never saw Costner around the place, and that she never saw Factor or anybody else in custody there and had never heard Factor discussed. It is urged that the court erred in calling her as a court witness. The State's attorney informed the court that prior to the first trial she had made a sworn statement in which she identified pictures of Touhy, Connors, Banghart and Schafer; that she stated she had seen them at the Glenview house; that on the first trial she contradicted that statement and denied she had ever seen Touhy, Schafer or Connors there; that she would persist in her denial and that the State could not vouch for her veracity. In *Carle* v. *People,* 200 Ill. 494, we approved the calling of an eyewitness to a crime for whose veracity the State's attorney could not vouch. Subsequently, in *People* v. *Cleminson,* 250 Ill. 135, a witness called by the court who knew nothing about the crime was subjected to a searching and scurrilous cross-examination on collateral matters. We said in that

case that the practice of the court calling a witness at the request of either party should not be extended beyond the limits of the rule announced in the *Carle case,* but we have never held that the power of a trial court to call a witness is limited to the calling of an eye-witness. We have held the rule to be that a witness should not be called except where it is shown that otherwise there may be a miscarriage of justice. Where the State's attorney for some reason, of which he informs the court, doubts the integrity or veracity of a witness he is not obliged to call him, but the court may call the witness and allow him to be cross-examined by either side. The practice should not be extended further than this, and the cross-examination should be limited to the issues. (*People* v. *Daniels,* 354 Ill. 600; *People* v. *Rotello,* 339 id. 448; *People* v. *Johnson,* 333 id. 469.) Clara Sczech was employed at a rendezvous of the defendants, rented at Touhy's direction. She was connected with the house and with the defendants. The court was advised of sufficient reasons why the State's attorney could not vouch for her credibility. There was no error in calling her as a court witness.

It is complained that the defendants were not allowed to develop evidence relating to the previous kidnapping of Factor's son, his release without ransom, and the details of a gang war between the Al Capone gang and the Touhy gang concerning the illegal distribution of beer. It is urged that such evidence would tend to show that Factor was kidnapped by the syndicate or that the charge was falsely made in order to escape extradition. In connection with the gang war it is claimed that one of the People's witnesses identified a guard at the Dells as one of the kidnappers and that the Dells was operated by the Capone gang. The witness did not identify one of the kidnappers as a guard. He testified that he saw the man leaning against a car in the Dells yard and "concluded" he was a guard. There is no other testimony even tending to show

that the man was a guard at the resort. The evidence shows that Silvers, the man who twice came out and communicated with the kidnappers just prior to the capture, was in conference with Touhy and his associates on two days shortly afterward. Even though Factor's son was released without ransom from an earlier kidnapping through the efforts of members of the Capone gang, and even though there was a gang war over illegal beer territory, those facts would not tend to throw any light on the issues. It would rather tend to becloud them. The court did not unduly limit the testimony in the respects complained of.

The instruction given by the court concerning the penalty for kidnapping is not subject to the criticism pointed out in *People* v. *Rongetti,* 331 Ill. 581. There the defendant was charged with abortion, and the instruction covered not only that crime but the crime of attempted abortion as well. The instruction here complained of does not cover two separate offenses. It merely defines the elements of the crime, and the jury could not have been misled by it.

The following instruction was given:

"The defendants under the law are presumed to be innocent of the charge in the indictment and this presumption remains throughout the trial with the defendants until you have been satisfied by the evidence in the case beyond all reasonable doubt of the guilt of the defendants. * * * Throughout this case the burden of proving the guilt of the defendants beyond all reasonable doubt is on the State and the law does not require the defendants to prove their innocence."

It is objected that the instruction intimates the presumption need not prevail during the whole trial but only "until something happens." The instruction is unlike the instruction condemned in *People* v. *Ambach,* 247 Ill. 451, and the objection is unfounded. An instruction of similar import but in different language was approved in the *Rongetti case, supra.* Instructions are given after the hearing of all the

evidence and the arguments of counsel, and we are unable to see wherein the jury could have considered this instruction other than in connection with the whole case.

The court instructed the jury as to the meaning of reasonable doubt. We have often criticised the giving of a similar instruction because the term needs no definition but thus far we have never held the giving of such an instruction to be reversible error.

An instruction advised the jury that they are the sole judges of the credibility of the witnesses and enumerated the general tests to be considered. It is objected that a different test is to be applied to accomplices, and that it was not within the province of the court to single out and indicate that a witness may be corroborated or contradicted. This instruction is not subject to either criticism. The tests enumerated were applicable to the testimony of accomplices as well as other witnesses.

The next instruction dealt only with accomplices. It is:

"Walter Henrichsen, Isaac Costner and Basil Banghart are persons defined by law to be accomplices to the crime charged in this indictment. The testimony of an accomplice is competent evidence but such testimony is liable to grave suspicion and should be acted upon with great caution. If the testimony of an accomplice carries conviction and the jury are convinced of its truth beyond a reasonable doubt they should give it the same weight as would be given to the testimony of a witness who is in no respect implicated in the offense and *the credibility of such an accomplice is for the jury to pass upon as they pass upon the credibility of any other witness.*"

The only objection made at the trial to this instruction by counsel for the defendants was, "that Basil Banghart does not come in the class of accomplice, not having been called by the State but having been called by defendants." It is argued that there should be a different rule applicable to Henrichsen and Costner, who took the stand for the

People and confessed their guilt, than that applicable to Banghart, who testified for the defendants and denied his guilt. Although the term "accomplice" is generally applied to those testifying against their fellow-criminals, (*Cross* v. *People,* 47 Ill. 152,) an accomplice is one who is in some way concerned in or associated with another in the commission of a crime. (Bouvier's Law Dict.; *People* v. *Turner,* 260 Ill. 84; *Cross* v. *People, supra.*) No reason is advanced, and none is apparent, why one who is in fact an accomplice should not have his testimony scrutinized carefully before it is relied on, no matter on which side of the case he testified.

It is urged that the portion of the above instruction which we have italicized renders it reversible error under the holding in *People* v. *Rongetti,* 338 Ill. 56. In that case the instruction was held to be erroneous because it charged the jury to pass upon the credibility of an accomplice in the same way as they pass upon the credibility of any other witness. The accomplice testified for the State, and the defendant had a right to have the jury instructed that his testimony should be put to a severer test than that which is applied to ordinary witnesses. The defendant was prejudiced by the omission to so instruct the jury, but in this case, Banghart, who is the only witness referred to in the objection, was a witness for the defendants, and if the jury were not required to apply strict scrutiny to his testimony the result would favor the defendants and they cannot complain of the error. Counsel for the defendants urge other objections to the instruction, but they were not included in the specific objection made in the trial court and they will not be further considered.

Some of the evidence was circumstantial, and the court did not err in giving an instruction defining it. Nor was there any error in giving the instruction defining accessories. Some of the defendants who were not placed at the scene of the actual kidnapping by the People's witnesses

were connected by the testimony with other phases of it, bringing them within the terms of the definition.

The jury were instructed that if they believed from the evidence, beyond all reasonable doubt, that any defendant in this case collected or attempted to collect ransom or money from John Factor knowing him to have been so seized or secreted for the purpose of collecting ransom, such defendant is guilty of kidnapping for ransom. The objection raised to the instruction in the trial court is, that it would include an accessory after the fact and is misleading. It is urged that under its language it is possible to connect the attempt to collect money at Willow Springs with the original crime. If the testimony is to be credited, that incident was a part of the crime and those engaged in it were participants in the whole program. The instruction might well have been couched in better language, but it was not misleading and there was no reversible error in giving it.

In addition to adopting five suggestions offered by the defendants the court refused thirty-two others offered by them. Fourteen of the offered suggestions were on the question of the credibility of the witnesses and the weight to be accorded the testimony of accomplices. One was on the failure of the defendants to testify. Others were on reasonable doubt. Each of these subjects and other suggestions offered were covered by other given instructions. We have often condemned the practice of giving numerous instructions upon the same subject. There was no error in refusing the suggestions.

An alibi suggestion offered by the defendants told the jury that "if in view of all the evidence, the jury have a reasonable doubt as to whether either of the defendants was present but was in some other place when the crime was committed, they should give such defendant or defendants the benefit of the doubt and find them not guilty." It was not necessary for a defendant to be actually present at the

kidnapping if he was otherwise a party to the crime. The suggestion was correctly refused.

After a careful consideration we are of the opinion there was no reversible error in the giving or refusal of instructions.

In support of the contention that the evidence is not sufficient to show the defendants' guilt beyond a reasonable doubt, the sufficiency of the identifications and the testimony of the accomplice witnesses are particularly attacked. Several matters alleged to be discrepancies are urged. It is always to be expected that in a case where the evidence is as voluminous as this there will be some conflict in the testimony. The identifications are not disputed. The jury saw and heard all the witnesses, including the accomplices. The weight of the testimony was for the jury to determine. The evidence so overwhelmingly establishes the guilt of the defendants that the jury could not reasonably have arrived at any other verdict.

We have examined in detail the many objections and criticisms urged upon us and find no reversible error. The question upon review is not whether the record is perfect but whether the defendant has had a fair trial under the law and whether his conviction is based on evidence establishing his guilt beyond a reasonable doubt. Where the error complained of could not reasonably have affected the result the judgment will be affirmed. *People* v. *Cardinelli,* 297 Ill. 116; *People* v. *Haensel,* 293 id. 33.

The effort to show partisanship and bias on the part of the trial judge is wholly unjustified. His rulings, in the main, were correct and we find no prejudicial error in any of them. The defendants were accorded a fair trial, and the jury were justified from the evidence in finding them guilty beyond a reasonable doubt.

The judgment of the criminal court is affirmed.

*Judgment affirmed.*