STATE OF MAINE
*vs.*
JOHN B. SANBORN

Waldo.   Opinion, September 15, 1961.

*Richard W. Glass*, for state.

*William N. Niehoff*, for plaintiff.

SITTING: WILLIAMSON, C. J., WEBBER, TAPLEY, SULLIVAN, SIDDALL, JJ.   DUBORD, J. did not sit.   OPINION (major-

ity) SULLIVAN, J., joined by TAPLEY, J. with WILLIAM-SON., C. J. concurring specially in the result. SIDDALL, J. dissenting by special opinion and joined by WEBBER, J.

SULLIVAN, J.  John B. Sanborn was by indictment accused of the offense of having on May 20, A. D. 1956 feloniously bought, received and aided in concealing 27 listed articles of furniture which had been previously stolen by George Webber from Reynolds Brothers, Inc., R. S., c. 132, sec. 11.  Upon his arraignment Sanborn pleaded not guilty. A jury was empaneled and a trial was had to the extent of the presentation of the State's case and partial examination of the first defense witness when the presiding Justice spontaneously declared a mistrial.  Respondent immediately objected to such direction by the Justice.  Respondent was thereafter subjected to a second trial and punctually interposed a plea of double or former jeopardy. His plea was denied and he now prosecutes his timely exception to that unfavorable ruling.

There follows an abridgement of the significant evidence presented at the first trial.

In the spring of 1956 George Webber a next door neighbor of the Respondent and an acquaintance through 14 years was working as a night employee at the furniture mill of Reynolds Brothers, Inc.  Sanborn had visited Webber at night at the mill 3 or 4 times and had talked with the latter of stealing furniture from Webber's employer. About March, 1956 on a street the Respondent solicited Webber to obtain for the former some furniture or parts from the mill.  Webber protested: "No, I will probably get caught."  Sanborn countered with the admonition: "You be careful you don't get caught."  Webber was to be paid by Sanborn $3 or $4 for each article taken.  During an estimated period of 2 months Webber had stolen several pieces of furniture from his employer, had taken them to

his home and had sold all of them to Sanborn. Webber identified 3 checks acquired by him from the Respondent in payment for certain of the purloined chattels. The checks were received in evidence. All items stolen had been integral. Two were unfinished. 26 pieces of furniture were collocated in the courtroom at the trial and were marked seriatim State's Exhibits 1 through 26.

Webber identified Ex. 1 as a telephone bench manufactured by Reynolds Brothers, Inc. at its mill and stated that he had stolen some 3 or 4 telephone benches such as Ex. 1 and had sold them to Sanborn for $3 apiece.

Webber described Ex. 2, 3 and 4 as telephone benches made by the mill, testified he had stolen 4, 5 or 6 and sold them to Sanborn.

He identified Ex. 5 as a small table produced by the mill, said that he had stolen as many as 6 of such in March or April or May, 1956 and had sold them to Sanborn.

Webber recognized Ex. 6 through 17 as tables manufactured by the Reynolds mill.

Ex. 6 he termed a clover leaf table. He said that he had stolen several like objects from the mill and had sold them to Sanborn in March, April or May for $2.50 each.

Webber designated Ex. 7 as a clover leaf table and a product of the mill. He asserted that he had purloined several such and had sold them to Sanborn in March, April or May for $2.50 apiece.

State's Ex. 8 the witness called a clover leaf step end made by the mill. He related that he had abstracted several of the kind and had sold them to Sanborn for $2.50 each.

State's Ex. 9 the witness denominated a clover leaf step end and a product of the mill. He told that he had filched

several like the exhibit and had sold them in March, April or May, 1956 to Sanborn for $2.50 apiece.

Webber labelled State's Ex. 10, 13 and 16 lamp, magazine or coffee tables produced by the mill. He had stolen several of such items and had sold them to the Respondent for some $2 each.

Ex. 12, 14 and 17 the witness termed clover leaf step ends from the mill. He had pilfered several of their kind and had sold them in March, April or May, 1956 to Sanborn for $2.50 apiece.

Ex. 18, 19, 20 and 21 Webber classified as magazine racks with 2 steps and as products of the mill. He stated that he had stolen several such and had sold them to the Respondent in March, April or May, 1956 for $3 each.

Ex. 22 the witness called a square table, 15 inches high and manufactured at the mill. In March, April or May he had purloined 2, 3 or 4 and had sold them to Sanborn for $2.50 apiece.

Ex. 23 the witness styled a corner table made at the mill. He admitted having abstracted 2 or 3 like articles and having sold them to Respondent for $2.50 each.

Webber testified that Ex. 24 was probably a lamp table and magazine rack produced in the mill. He confessed that he had stolen several items of the kind and had sold them to Sanborn in March, April or May, 1956 for $2.50 each.

The witness swore that Ex. 25 was a desk or table made by the mill, that he had pilfered several of them and had sold them to Sanborn for $2.50 apiece.

Ex. 26 the witness named a table or school desk. He told of having filched several of such item in March, April or May, 1956 and of having sold them to Sanborn for $2.50 each.

The witness divulged that Sanborn was aware of Webber's thievery while the Respondent was purchasing the furniture appropriated.

Webber in none of his testimony pronounced that Ex. 1 through 26 were the objects stolen and sold. He described the exhibits as facsimiles of the looted goods.

Sanborn by avocation was a furniture dealer. On May 20, A. D. 1956 Pitt J. Smith who was likewise by subordinate occupation a furniture tradesman bought from the Respondent Ex. 1 through 26 in the normal course of trade. Smith supplied to the court Sanborn's receipt for the purchase price paid by Smith for the articles. During the investigation of Webber's abstractions Ex. 1 through 26 had been traced by the sheriff's department to the possession of Smith who readily relinquished those articles to the authorities. Smith identified Ex. 1 through 26 in court and at the same time affirmed that the exhibits were in the same condition as when acquired by Smith from Sanborn.

Ronello Reynolds, director, president and treasurer of Reynolds Brothers, Inc., owner of the mill, related that the mill had missed articles from its inventories, once a week. The lost items had been present in the mill at night and gone on the following morning. This witness recognized Ex. 1 through 26 as first grade current products of the mill and not as samples. Samples, he explained, were made by hand rather than by machine. He averred that only he and his brother, Edward, had had the right to sell furniture from the mill. The witness had never sold any articles similar to Ex. 1 through 26 to either George Webber or Sanborn. The mill had sold only at wholesale and not at retail. Ex. 1 through 26 had all been manufactured since April 25, 1955 following a fire which had consumed a former mill on September 17, 1954. The witness explained that Ex. 1, 2, 3, 4, 22 and 24 had been finished at the mill

but that Ex. 5, 6, 7, 10, 11, 14, 15, 16, 18, 19, 20, and 21 had been completed but not finished. He declared that he had never sold, given away or disposed of any class A-1 manufactured furniture which had not been completed with finish. Sanborn had sought several times without success to buy pieces of furniture from the mill. The witness placed a value upon each of Ex. 1 through 26 and described such articles as we shall note later in this opinion.

Edward Reynolds, production manager of the mill, corroborated the fact that Ex. 1 through 26 were the manufacture of Reynolds Brothers, Inc. and that he and his brother, Ronello, shared exclusively the authority to sell the mill products. The witness had never sold any complete articles to Sanborn with one negligible exception. The witness had not sold any complete items to George Webber or to anybody except to wholesale dealers.

Ex. 1 through 26, with the exception of Ex. 11, were offered by the prosecution without comment and were admitted in evidence by the Court over the objection of Respondent's counsel who opposed because the items were not and had not been demonstrated to be the personal property described in the indictment.

Ex. 1 through 26 had been utilized by the State throughout the trial as models, replicas or standards and as typical products in their respective kinds from the mill. Wigmore on Evidence, 3rd. Ed., secs. 439, 791, 793.

> "Rule 105. *Control of Judge Over Presentation of Evidence.*
>
> The judge controls the conduct of the trial to the end that the evidence shall be presented honestly, expeditiously and in such form as to be readily understood, and in his discretion determines, among other things,
>
> (j) whether a witness in communicating admissible evidence may use as a substitute for oral

testimony or in addition to it a writing, model, device or any other understandable means of communication, and whether a means so used may be admitted in evidence;"

American Law Institute: Model Code of Evidence.

There had been no stated profession that Ex. 1 through 26 were some of the self-same chattels which George Webber had stolen from the mill and had sold to Sanborn. The Reynolds did not assert that they recognized Ex. 1 through 26 as articles stolen by Webber or purchased by Sanborn although the brothers had declared that they had sold no such products to any persons other than dealers and had not sold such products in an unfinished state even to dealers. The Court voiced or assigned no determinant for his acceptance in evidence of Ex. 1 through 26 at the time of their admission. In the record we find no comment upon the fact that some of Ex. 1 through 26 had not been described in testimony to conform with any items of furniture designated in the indictment.

"In the case before us, the subject matter is a pine log, marked in a particular manner described. The marks determine the identity; and are therefore matter purely of description. It would not be easy to adduce a stronger case of this character. It might have been sufficient to have stated, that the defendant took a log merely, in the words of the statute. But under the charge of taking a pine log, we are quite clear, that the defendant could not be convicted of taking an oak or a birch log. The offence would be the same; but the charge, to which the party was called to answer, and which it was incumbent on him to meet, is for taking a log of an entirely different description. The kind of timber, and the artificial marks by which it was distinguished, are descriptive parts of the subject matter of the charge, which cannot be disregarded, although they may have been unnecessarily introduced. The log proved to have been taken, was a different one from that

charged in the indictment; and the defendant could be legally called upon to answer only for taking the log there described - - -"

*State* v. *Noble,* 15 Me. 476.

"When a material allegation is made unnecessarily precise by a two particular description, the descriptive averment cannot be separated and rejected but must be proved as laid. Thus where a sheet was described as a woollen sheet, though the statement of material was unnecessary, the epithet must be proved to procure a conviction; so where a horse was needlessly described as a white horse; logs as marked with a certain brand; - - - - So if money is needlessly described the proof must correspond to the description."

Criminal Pleading and Practice: Beale, sec. 112, P. 114.

The following tables will exemplify and clarify several coincidences between the chattels arrayed in the indictment and the denomination by witnesses of Ex. 1 through 26.

*Indictment*

Item 1. 1 large step-end table
2. 4 telephone benches
3. 1 lamp table
4. 11 step-end tables
5. 1 end table model No. 1251 N.
6. 4 three step tables
7. 1 square table
8. 1 corner table
9. 1 magazine rack
10. 1 large cocktail table
11. 1 small cocktail table

Total 27

*Testimony of George Webber*

Ex. 1 telephone bench     *2nd item, indictment*
Ex. 2 telephone bench     *2nd item, indictment*

Ex.  3 telephone bench          *2nd item, indictment*
Ex.  4 telephone bench          *2nd item, indictment*
Ex.  5 small table
Ex.  6 clover leaf table
Ex.  7 clover leaf table
Ex.  8 clover leaf step end
Ex.  9 clover leaf step end
Ex. 10, 11, 13, 16 lamp, magazine or
    coffee tables               *3rd item, indictment*
Ex. 12, 14, 17 clover leaf step ends
Ex. 18, 19, 20, 21 magazine racks   *9th item, indictment*
Ex. 22 square table, 15 inches tall  *7th item, indictment*
Ex. 23 corner table              *8th item, indictment*
Ex. 24 probably lamp table or
    magazine rack        *3rd, 9th items, indictment*
Ex. 25 desk or table
Ex. 26 table or school desk, etc.

*Testimony of Ronello Reynolds*

Ex.  1 to 4 No. 2550 gossip bench or
        telephone stand          *2nd item, indictment*
Ex.  5       No. 2510 or 2511 end table
Ex.  6       No. 2577 step end
        table                    *4th item, indictment*
Ex. 16       No. 2585 step end
        table                    *4th item, indictment*
Ex. 15       No. 2589 step end
        table                    *4th item, indictment*
Ex. 18       No. 2547 step end
        table                    *4th item, indictment*
Ex. 24       magazine rack       *9th item, indictment*
Ex. 22       No. 2588 square cocktail
        table, Danish, modern
Ex. 23       No. 2584 corner table  *8th item, indictment*
Ex. 25       No. 2553 cocktail table
                   *10th or 11th item, indictment*
Ex. 26       No. 2514 cocktail table
                   *10th or 11th item, indictment*

(Ronello Reynolds explained that a gossip bench and a telephone bench are one and the same article.)

The record then manifestly discloses that several of the 27 items enumerated and described in the indictment are

identical with testified descriptions of certain units included within the group of Ex. 1 through 26. In respect to each and every individual chattel so demonstrated by evidence as present simultaneously and coexistently both in the indictment and amongst Ex. 1 through 26, there is the testimony of George Webber that he stole from Reynolds Brothers, Inc. and sold to a knowing Sanborn several facsimiles of that specific object. The Ex. 1 through 26 thus designedly or merely fortuitously served to supply several replicas both of some articles which had been allegedly pilfered by George Webber and sold to the accusedly culpable Sanborn and also of those same articles as they appear by name in the catalogue of the indictment. Many units amongst Ex. 1 through 26, therefore, had a serviceful office as concrete visual aids in contribution to the prima facie case which the State had no doubt achieved.

It had been incumbent upon the State to afford credible evidence of the felonious buying, receiving and concealing by Sanborn of only one article as listed in the indictment. As stated in *Criminal Pleading and Practice, Beale,* Sec. 110, P 113:

"- - - Where an indictment alleges the larceny of several articles, a conviction may be had, though some of the articles are insufficiently described, or are not proved to have been taken (Maloney v. S.—Tex. C. R.—45 S. W. 718) ; where an obtaining of goods is alleged by several false pretences, it is enough to prove one; where in an indictment for perjury several false statements are averred, conviction may be had on proof of one (C. V. Johns, 6 Gray, 274; Harris V. P., 64 N. Y. 148) where an act is alleged to have been done with several intents, proof of one is enough (R. V. Evans, 3 Stark, 35)"

Upon the case record to the moment of their admission by the Court Ex. 1 through 26 were proper evidence upon applicable and sound theory. Some of such exhibits were

at least replicas or facsimiles both of chattels assertedly stolen by Webber and sold to Sanborn and of certain chattels set forth in the indictment. All of Ex. 1 through 26 had been placed through testimony in the possession of Sanborn who could not have purchased them from Reynolds Brothers, Inc. which had manufactured them. They were identical with chattels stolen by Webber from the factory and sold by him to Sanborn. Credible circumstantial evidence afforded a basis of inference that Ex. 1 through 26 were personal property stolen by Webber, sold by him to a knowing Sanborn and latterly discovered in Sanborn's possession. The factory had sold no furniture to Webber or Sanborn or to any person other than factory dealers. Those amongst Ex. 1 through 26 which had been described by witnesses variantly from the representation of articles listed in the indictment were, because of testimony in the case and subject to proper instruction from the court, eligible in evidence as stolen property possessed by Sanborn. Such exhibits were probative in establishing scienter and intent. *Nickerson* v. *Gould*, 82 Me. 512, 515; *State* v. *Smith*, 140 Me. 255, 274, 276; *State* v. *Carson*, 66 Me. 116, 118; *State* v. *Acheson*, 91 Me. 240, 246; *State* v. *Fogg*, 92 N. H. 308, 311, 30A (2nd) 491, 493; *Wigmore on Evidence*, 3rd Ed., §§ 153, 324, 325, 327, 2513; *Annotation* 3 A. L. R. 1213, 1219, 1220.

However, subsequent to the admission of Ex. 1 through 26, with the exception of Ex. 11, in evidence and following the conclusion of the State's case the prosecutor by leave of court recalled Ronello and Edward Reynolds to testify further, with the following results:

### RONELLO REYNOLDS

"Q. Did you, if I remember correctly, did you testify in direct examination that it wasn't your practice to sell to any individuals?
A. Yes.

Q. Is that the part you wish to explain?
A. Yes.

- - - - It was common practice to sell any furniture which we made, not only which we made but which we were able to buy, to the employees at cost. That's been a common practice and being so common a practice I forgot it at the time.

Well, I forgot that we did. It was so common a practice to sell to employees at cost that I forgot that. I answered your question meaning anyone outside.

Sold them anything they wanted. Sometimes they bought pieces to put together themselves, sometimes they bought first quality.

Q. Referring to State's exhibit from 1 to 26 or similar articles of furniture, did you ever sell any of those to George Webber?
A. No.

### Edward Reynolds

"I made the statement that I had sold no furniture to anyone in 1956, and I wish to retract that statement and make an exception, I have sold furniture to employees.

I just didn't think, it was natural to sell to employees.

Q. Well did you sell to any outsiders?
A. No.
Q. Did you ever sell any of the furniture that has been admitted as exhibits in this case or any similar furniture to George Webber?
A. No.

Q. Didn't you testify then under oath that you never sold any similar pieces as described from State's exhibits 1 to 26 to anyone?
A. I did.

Q. And you still stick to that?
A. No, I make the exception we sold to employees.

Q. From 1 to 26? Some of this stuff?
A. Oh yes.

I sold to several employees."

The State rested after the recall of the Reynolds. The Respondent had presented one witness who was being cross examined when the presiding Justice spontaneously recessed the trial and informed counsel of an urgency to confer with them upon a matter of law. The Justice thereupon addressed counsel as follows:

"Gentlemen, as you know, during recess I have been considering the question as to whether I should declare a mistrial in view of the fact that exhibits 1 to 26 have been introduced and admitted, and a great deal of testimony concerning exhibits 1 to 26 has been admitted over the objections of the respondent, and now it appears to me in view of the testimony we heard this morning from Ronello and Edward Reynolds, those exhibits and a great deal of that testimony should not have been admitted, and would not be admitted if that testimony had been given prior to the rulings the Court made on the various points concerning the exhibits as they came up. Had I known that the Reynolds Brothers sold furniture to their employees as they have said this morning, I would not have admitted State's 1 to 26, and I would not have allowed a great deal of testimony which was given concerning those exhibits, and so as you know, I have been considering whether I should declare a mistrial, and I expect, Mr. Niehoff, you would like to state your position?"

Defense counsel forthwith objected to the granting of a mistrial. He expressed a willingness to waive the objection upon certain stated conditions which the Justice deemed unacceptable. The Justice continued:

"I am going to decline to do that Mr. Niehoff, because I am convinced that that testimony concerning the exhibits is so involved with all the other testimony in the case, I don't feel the jury could be expected to understand what they are to disregard and what they are not to disregard. And it appears to me that the only way a fair trial can take place in this case is—or I should say it appears to me there is no way a fair trial could take place if the case continues before this jury, it has heard so much testimony which now appears to have been testimony they should not hear, and so over - - in spite of the suggestion and the offer which you have made, I am going to declare a mistrial - - - so I am ordering a mistrial."

Defense counsel straightway excepted.

A resultant of such later and corrective testimony of the two Reynolds brothers was to concede possibilities of Sanborn having obtained furniture from Reynolds Brothers, Inc. mill legitimately and from sources other than George Webber. The revised testimony quite dispelled the significance of the narrated circumstance that Sanborn had had in his possession Ex. 1 through 26 which he had sold to Pitt J. Smith and which the latter had produced in court. The rectified testimony served to render no longer factually inferential but merely conjectural a conclusion that Ex. 1 through 26 were some of the very objects stolen by Webber and assertedly sold to Sanborn. Nevertheless the chastened testimony did not annul the admissibility of several of Ex. 1 through 26. Many such exhibits by testified description and classification had counterparts in the indictment list and so had had a proper and abiding function as visual aids or models. *Wigmore on Evidence,* 3rd. Ed., sec. 439, 791, 793; *American Law Institute; Model Code of Evidence,* Rule 105. It remained that many of the controversial exhibits had qualified for admission and had been admitted.

The testimony of the Reynolds brothers in so far as it had been self-contradictory had been evidentially repudiated by their recantation. Also in the same aftermath the testimony and written evidence from Pitt J. Smith concerning Sanborn's possession and sale to Smith of Ex. 1 through 26 had been revealed as devoid of probative office and calculably hurtful to the Respondent. The testimony of Sheriff Heath as to his impounding of Ex. 1 through 26 assumed an objectively illicit status. Nevertheless testimony of George Webber concerning his theft and sales to Sanborn of facsimiles of certain of Ex. 1 through 26 which had not been described in the indictment remained legitimate with suitable jury instruction. *State* v. *Carson,* 66 Me. 116, 118; *State* v. *Witham,* 72 Me. 531, 535; *Nickerson* v. *Gould,* 82 Me. 512, 515; *State* v. *Acheson,* 91 Me. 240, 246.

The trial was by definition criminal and not civil. Participation in it by the Respondent was by constraint. He had not been an accessory to any dilemma precipitated by the retraction of the Reynolds brothers. Not so, as to the State. The pre-trial conferences of the prosecution with those 2 witnesses could hardly have been thorough or adequate. Routine inquiry of the Reynolds brothers by the prosecutor in advance of the trial would have obviated the incorrect testimony.

The Constitution of Maine, Article 1, guarantees against the oppressive evils of double or former jeopardy.

> "Section 6. No person, for the same offense, shall be twice put in jeopardy of life and limb."

The Constitution of the United States contains a like provision. Amendments, Article V.

The Respondent's plea of double or former jeopardy raises an issue which has been expressed beyond betterment by this court in *State* v. *Slorah,* 118 Me. 203, 208, as follows:

"The respondent urges in support of his exceptions as a matter of law that jeopardy began when the jury was impanelled and sworn at the January term, and that when jeopardy has once attached he was entitled to a verdict from the jury of either guilty or acquittal; that if the case was withdrawn by the court from the jury without his consent, *except for what has been termed by the courts, urgent, manifest or imperious necessity,* he should be discharged and may plead former jeopardy, if placed on trial again on the same indictment or for the same offence. *Such we hold to be the law.*" (italics supplied)

Protection against former or double jeopardy is a basic and fundamental right. Yet there can supervene circumstances, conditions and uncontrollable mischances obtruding themselves into criminal trials from time to time rendering it necessary that a Justice administering the trial without the consent of the accused end the proceedings and discharge the jury before verdict to maintain and preserve impartial justice for respondent or State or both. No human being could a priori anticipate the varieties of such crises. When the cogency for a mistrial becomes sufficiently impelling and where a response to it cannot be justly protested by the respondent a second trial does not violate the latter's fundamental privilege. Were it otherwise many guilty could secure unconscionable impunity through pure mishap or their own malfeasance.

An early and venerated authority is *U. S.* v. *Perez,* 9 Wheat. 579, 580: (jury unable to agree)

"- - - We think that in all cases of this nature, the law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a *manifest necessity* for the act, or the ends of public justice would otherwise be defeated. They are to exercise a *sound* discretion on the subject; and it

it impossible to define all the circumstances, which would render it proper to interfere. To be sure, the power ought to be used with the *greatest caution*, under *urgent circumstances*, and for very plain and obvious causes; and, in capital cases especially, Courts should be extremely careful how they interfere with any of the chances of life, in favour of the prisoner. But, after all, they have the right to order the discharge; and the security which the public have for the faithful, sound, and conscientious exercise of their discretion, rests, in this, as in other cases, upon the responsibility of the Judges, under their oaths of office. - - - -" (italics ours)

As is said in *State* v. *Slorah*, 118 Me., 209, 210:

"Certain conditions, if arising, in the trial of a case, have come to be well recognized as constituting that 'urgent necessity' which will warrant the discharge of a jury, and if they appear of record will bar a plea of former jeopardy: (1) the consent of the respondent, (2) illness of the court, a member of the jury, or the respondent, (3) the absenting from the trial of a member of the panel or of the respondent, (4) where the term of court is fixed in duration and ends before verdict, (5) where the jury cannot agree.

"Of the conditions, except as found in the decided cases, more cannot be said than that in all cases, capital or otherwise, they must be left to the *sound discretion* of the presiding Justice, acting under his oath of office, having due regard to the rights of both the accused and the State, and subject to review by this court. - - -" (italics ours)

As to "sound discretion" this Court commented in *Charlesworth* v. *Amer. Express Co.*, 117 Me., 219, 221:

"- - - It must be sound discretion exercised according to the well established rules of practice and procedure, a discretion guided by the law so as to work out substantial equity and justice. It is magisterial, not personal discretion. The chief

test as to what is or is not a proper exercise of judicial discretion is whether in a given case it is in furtherance of justice. If it serves to delay or defeat justice it may well be deemed an abuse of discretion. - - -"

In *U. S.* v. *Whitlow,* 110 F. Supp. 871, 872 the Court commented:

"Ordinarily a defendant in a criminal case has the privilege, granted to him by the above-mentioned clause of the Constitution of securing a verdict from the jury originally impaneled and sworn to try him. This guaranty is no mere technicality, but constitutes a substantial right. It not only safeguards the defendant against being put to the agony, expense, and trouble of a second trial, but it also entitles him to secure a verdict from the particular jury that has started to hear the case. This privilege may prove at times very valuable, because the defendant may feel that the jury which is trying the case may be more favorably disposed to him than some future jury might be."

In *Baker* v. *Commonwealth,* 280 Ky. 165, 132 S. W. (2nd) 766, 768 we find:

"In the present case the accused had participated in the selection of a jury and were willing to risk their chances with the jury thus selected but the action of the trial court compelled them to assume the additional peril of being tried by a different jury."

It is noteworthy that in the present case, apart from prospects of acquittal, the Respondent, John B. Sanborn, at mistrial had achieved considerable progress. He was being tried under R. S., c. 132, sec. 11, a statute with special provisions as to degrees of punishment. He had succeeded in substantially reducing the number and aggregate value of chattels which the State by the indictment could persist in contending he had culpably bought and received. He may have already dwarfed the accused

offense from felony to misdemeanor. He had attained some positive advantage.

Lamar, J., concurring in *Oliveros v. State,* (Ga.), 47 S. E. 627, 630 comprehensively discoursed:

"- - - The bystanders may cry, "Hang him! Hang him!" as in Woolfolk's Case (Ga.) 8 S. S. E. 724; and on motion therefor a mistrial might properly have been granted. The result would not have been different if a mob had invaded the court room with shouts of "Acquit him! Turn him loose!" In either case a mistrial is ordered because demanded by the ends of justice. The judge himself might feel called on to make such an order because of his own conduct, where he had inadvertently done an act which would vitiate the verdict. So, too, the misconduct of jurors, counsel, accused, or bystanders might likewise be such as to authorize a mistrial. Not that it was physically or morally impossible to proceed with the trial such as it is or would then be. It could go on as a physical fact, as it did in Woolfolk's Case; but the verdict of acquittal or conviction would never be recognized as that calm and deliberate judgment of 12 men to which the accused was entitled, and to which, be it noted, the state was also entitled. A mistrial is not a necessary result of misconduct, but a cure made necessary by misconduct. It is not so much a necessary effect as a necessary remedy to prevent the effect. *Of course if the occurrence is one calculated to harm the defendant alone, he may choose to waive it, and to have the trial proceed, and it would therefore usually be erroneous—as here—to order a mistrial over his objection.* But if the conduct was such as to prejudice the state, or to prejudice both the accused and the state, it would be for the court to determine what action he should take under the peculiar facts. It is impossible to lay down a rule. It must be left to the sound legal discretion of the trial judge acting under his oath of office, and having due regard to the rights of the accused and of the state, and subject to re-

view as in all other cases. The principle is probably as accurately stated as it is possible to do in Thompson's Case, 155 U. S. 271 - - - where it was said: 'Courts of justice are invested with authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a *manifest necessity* for the act, or the ends of public justice would otherwise be defeated, and to order a trial by another jury; and a defendant is not thereby twice put in jeopardy, within the meaning of the fifth amendment of the Constitution of the United States' - - -." (italics ours)

In the instant case the evidentiary plight which had evolved was prejudicial to the Respondent but not so to the State. The State sought no mistrial. The Respondent insisted upon waiving his right to a mistrial but was overruled by the court.

In *Oliveros* v. *State, supra,* 47 S. E. 627, 628 the Court further said:

"It would not do to hold that, whenever a judge comes to the conclusion that he has committed error in the trial of a criminal case he can declare a mistrial, and put the accused upon trial before another jury. No one could tell where such a ruling would lead. If the judge could do this in one trial, he could do it in the second or third, or even fourth. The law does not intend that one accused of crime shall be harassed in this way."

A misapprehension in judicial administration is not of itself sufficient to warrant a mistrial and to nullify jeopardy.

In *State* v. *Calendine,* 8 Iowa, 288 the State was conducting its case against the accused and before a jury and 2 witnesses had been examined when the court upon its own motion dismissed the indictment and discharged the prisoner in the mistaken belief that the indictment was defective. On appeal it was held that the indictment had been

valid and that the accused could not be tried again for the same offense. The opinion at Page 292 states:

"- - - Even the species of necessity supposed did not exist therefor, but the discharge arose from the will of the court."

In *State* v. *Wright,* 5 Ind. 290, the presiding justice at a criminal trial erroneously believed that the court term had expired and that the trial must close. He dismissed the jury, ended the trial and remanded the prisoner to jail for a new trial at the next court term. It was held on appeal that the trial court session could have continued until the conclusion of the trial, that there had been no necessity for withdrawing the case, that the respondent had been entitled to a verdict and that the proceeding was equivalent to an acquittal.

In *State* v. *Witham,* 93 Utah 557, 74 P. (2nd) 696, 698 is the statement:

"- - - but we all agree that a defendant ought in no case to be put on a second trial for the same offense where the jury has been discharged over defendant's objection, because the court - - - - may feel it has erred in prior rulings."

In *State* v. *Grayson,* (Fla.), 90 So. (2nd) 710, 713:

"- - - The reason for requesting the mistrial according to the statement of the Assistant County Solicitor was that there might be error in the record. Out of fear of the ultimate effect of such error, the prosecuting officer requested the discharge of the jury. We do not consider this to be an urgent or necessary reason for granting the motion for mistrial, absent the consent of the accused. - - -"

The testimony of the Reynolds brothers to the extent that it was inherently contradictory had bidden fair to neutralize itself in a large measure. Parenthetically one would opine that it had not enhanced the State's case. But

undebatably it had no justifiable presence in the trial. A rejection of it was obligatory together with its correlative and more prejudicial evidence consisting of the testimony and written exhibits of Pitt J. Smith as to Smith's purchase of Ex. 1 through 26 from Sanborn and the testimony of Sheriff Heath concerning the acquisition from Smith of the same exhibits. Likewise those exhibits amongst Ex. 1 through 26 which had been described and denominated variantly from chattels recited in the indictment required some explanation to the jury as to the special and limited probative function of such particular exhibits. *State* v. *Acheson*, 91 Me. 240, 246.

The errant evidence was ascertainable without difficulty and was rationally separable. An emphatic and conventional direction to the sworn jury upon his own initiative by the Justice would have dependably disabused the jury who could and would have, without the necessity of exceptional forbearance, prescinded from the prejudicial and illicit evidence.

"While there are cases to be found in some jurisdictions holding that the erroneous admission of objectionable evidence is not cured by its withdrawal coupled with an instruction to the jury not to consider it, such cases are exceptional. The great weight of authorities is in support of the rule that ordinarily the erroneous admission of improper evidence is cured, or so far cured as to be no longer a sufficient ground for a new trial, by being withdrawn or struck from the record and an instruction given to the jury to disregard it entirely." *McCann* v. *Twitchell*, 116 Me. 490, 493.

"- - - It is to be presumed the jury will follow the directions of the court. If it were not so, a witness might stop a cause in mid-trial, or it must proceed at the hazard of a new trial, and the court would be powerless to avert the evil by instructions, however pertinent and stringent. In the present case, if the jury gave heed to the court, and

we must presume they did, no harm was done, even if the evidence was not contradictory; for they were told it was not to be weighed as proof of the prisoner's guilt at all."

*State* v. *Kingsbury*, 58 Me. 238, 242.

"- - - It must be presumed that such an instruction would have effaced all prejudice, if any, resulting from the statement - - -"

*State* v. *Fortin*, 106 Me. 382, 384.     (See, also, *State* v. *Norton*, 151 Me. 178, 182.)

In the instant case as always the Respondent's constitutional guaranty against double jeopardy was a security which had to be esteemed as amongst the last of his rights to succumb or yield to circumstances.    For a presiding magistrate to direct spontaneously a mistrial against the objection of a respondent is to exercise an extraordinary power.    Such may be done only in *"urgent, manifest or imperious necessity." State* v. *Slorah, supra.*    The Respondent here had found himself in a vexed predicament in the creation of which he had had no proximate part. The resultant harm had been to him alone.    The State had not been without censure in the evidential evolvement at the trial.    The Respondent had an empaneled jury with which he appeared satisfied.    He had, too, the routine remedies for reversible error.

Under the controlling criminal statute the State had achieved doubtful success in demonstrating any felony.    The Respondent had elected to waive his right to a mistrial and had affirmatively objected thereto.    The court spontaneously overruled the Respondent from solicitude for the latter whom the court had despaired of otherwise extricating from a prejudicing involvement.    The court most creditably pursued the only course which he at the time judged could provide a fair trial for the Respondent.    The court had mistakenly assumed that the encores as witnesses of the Reynolds brothers had demonstrated that Ex. 1 through

26 had all been improperly admitted. The court had desponded of eradicating the prejudice from the accepted evidence. Subjectively the court had been motivated by most admirable and laudable inducements. There was wanting, however, that

> "- - - breakdown in the judicial machinery which renders further orderly and systematic procedure impracticable."

*State* v. *Witham*, 74 P. (2nd) 696, 697.

We fail to perceive in the record the urgent, manifest or imperious necessity for the mistrial ordered.

The Respondent's plea of former jeopardy is sustained.

Because of such conclusion it becomes unnecessary that this court consider further the remaining exceptions of the Respondent or his appeal.

*Exception sustained.*

*Case remanded to the Superior Court for Respondent's discharge.*

STATE OF MAINE
*vs.*
JOHN B. SANBORN

CONCURRING OPINION

WILLIAMSON, C. J.  I concur in the result reached by Justices Sullivan and Tapley and join with them in sustaining the plea of former jeopardy. My reasons differ in emphasis from those given in the main opinion drawn by Justice Sullivan in his thoughtful review of the facts and law. The issue involves a fundamental constitutional right of the respondent.

448

> "No person, for the same offence, shall be twice put in jeopardy of life or limb." Maine Constitution, Art. I, § 8.

> ". . . nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; . . ." U. S. Constitution, Art. V (jeopardy clause).

The right comes from the common law. See *Green* v. *U. S.*, 355 U. S. 184, 78 S. Ct. 221, 61 A. L. R. (2nd) 1119.

The principle governing mistrial without consent of the respondent as found in *U. S.* v. *Perez*, 9 Wheaton 579, and the facts of the instant case are fully stated in the main opinion.

In my opinion there was no "manifest necessity" within the *Perez* rule and the mistrial was not ordered within the sound discretion of the court.

The case, as I see it, comes to this. The State offered and there were admitted 26 pieces of furniture as the furniture that had actually been stolen by the thief. Later in the case two key witnesses for the State changed their testimony with the result that the court considered the furniture and related evidence had been erroneously admitted. The court thereupon ordered a mistrial against the objection of the respondent on the ground that the error, deemed by the court to be prejudicial to the respondent, could not be corrected by an instruction to the jury to disregard the objectionable evidence. ". . . it appears to me (the court) that the only way a fair trial can take place in this case is—or I should say it appears to me there is no way a fair trial could take place if the case continues before this jury, it has heard so much testimony which now appears to have been testimony they should not hear, . ."

The case does not present, in my view, an unusual situation. Evidence admitted at one time often becomes for

one reason or another inadmissible later. The jury is instructed to disregard the inadmissible evidence. The trial then continues to completion, with suitable objections or exceptions to preserve points for decision in the Law Court.

We are entitled to presume that the jury would have followed suitable instructions of the court. In *State* v. *Kingsbury,* 58 Me. 238, at 242, the court said:

> "The government may propose to contradict a witness in defense, and may call testimony for that purpose. The evidence fails to contradict the witness. The jury are instructed not to regard such testimony. When proper instructions are given, such admission is not deemed a ground for a new trial. It is to be presumed the jury will follow the directions of the court. If it were not so, a witness might stop a cause in mid trial, or it must proceed at the hazard of a new trial, and the court would be powerless to avert the evil by any instructions, however pertinent and stringent. In the present case, if the jury gave heed to the court, and we must presume they did, no harm was done, even if the evidence was not contradictory; for they were told it was not to be weighed as proof of the prisoner's guilt at all."

See also *State* v. *Cox,* 138 Me. 151, at 176, 23 A. (2nd) 634.

A finding of "manifest necessity" in the circumstances of this case would, I believe, breach the restrictions placed on mistrial to the disadvantage of the respondent protected as he is by the Constitution. Certainly in the meaning of the principle and in its application would thereby be lessened. The great protection against harassment by a powerful state would rest perhaps upon doubtful rulings on evidentiary problems. The solution of such problems should, in my view, be left to the appellate court and not decided in the trial court without the consent of the man who is in jeopardy.

The case of the respondent who objects to a mistrial does not often arise. The reason no doubt is that the respondent, feeling the heat of an impending guilty verdict, wishes the benefit of a mistrial and thus a new trial without the risk and expense of an appeal.

Such, however, is not the instant case. Here the respondent demands that the jury drawn to try the case between him and the State finish the task. The jury may be entirely satisfactory in its composition. His witnesses may be available now and not later. The expense and torment of a new trial may appear too burdensome. He may believe that with the State's evidence on the furniture removed, he will stand a better chance of a favorable verdict. He may be entirely confident that he will be found not guilty.

Without question, the court acted in his judgment for the protection of the respondent. There is no suggestion that the mistrial was designed to aid the State by giving time to reform its forces and to change its strategy. To grant a mistrial to benefit the State would of course have been improper. The mistrial was ordered, it must be assumed, on the premise that the admissible evidence in the case warranted a guilty verdict, otherwise the court would have directed a verdict for the respondent.

The cases, as I read them, add strength to the respondent's position. No case involves a mistrial without consent on the ground the court was unable to remove the effect of evidence erroneously admitted from the minds of the jury.

In *State* v. *Slorah,* 118 Me. 203, 205, 106 A. 768, the respondent on trial for murder, on a jury view at the scene of the alleged crime cried out, "My God! take me away from here or I shall be insane again." The court said, at p. 216:

> "The exclamation by him in the presence of the jury, however, that if he was not removed he would go insane again, was in the nature of evidence improperly presented to the jury out of court, - - an unsworn statement of the accused."

*Thompson* v. *United States,* 155 U. S. 271, 15 S. Ct. 73 (qualifications of a juror) ; *Wade* v. *Hunter,* 336 U. S. 684, 69 S. Ct. 834 (tactical needs of an advancing army in Germany preventing court martial) ; *U. S.* v. *Gori* (CA 2) 282 F. (2nd) 43, affirmed *Gori, Petr.* v. *U. S.,* S. Ct. June 12, 1961 (conduct of district attorney) ; *Lovato* v. *New Mexico,* 242 U. S. 199, 37 S. Ct. 107 (dismissal to permit arraignment) ; *People* v. *Thomas,* 15 Ill. (2nd) 344, 155 N. E. (2nd) 16 (judge charged defendant's attorney with attempting "a manufactured and sympathetic emotional appeal") ; *Simmons* v. *U. S.,* 142 U. S. 148, 12 S. Ct. 171 (incompetent juror and outside influence on jury) ; *U. S.* v. *Cimino,* 224 F. (2nd) 274 (prejudiced juror) ; *Scott* v. *U. S.,* 202 F. (2nd) 354 (withdrawal of counsel) ; *U. S.* v. *Perez, supra* (the typical "hung jury" case).

In *Brock* v. *N. C.,* 344 U. S. 424, 73 S. Ct. 349, the issue was whether there was a violation of the Fourteenth Amendment by a mistrial in the North Carolina Court on refusal of state's witnesses to testify on the ground of self-incrimination. The court concluded that this had long been the common law rule in North Carolina and did not violate the Fourteenth Amendment. The North Carolina rule is against the great weight of authority. Chief Justice Vinson, in dissenting, pointed out that no case in any other jurisdiction supported the North Carolina rule. See also *State* v. *Locklear,* 16 N. J. 232, 108 A. (2nd) 436, 442, for a review of cases.

We are not here concerned with the guilt or innocence of the respondent.

> "Assuming a failure of justice in the instant case, it is outweighed by the general personal security

afforded by the great principle of freedom from double jeopardy. Such misadventures are the price of individual protection against arbitrary power." *State* v. *Locklear, supra,* at p. 442.

STATE OF MAINE

*vs.*

JOHN B. SANBORN

DISSENTING OPINION (WEBBER JOINS)

SIDDALL, J. The respondent was charged with buying, receiving, and aiding in concealing stolen property. The articles alleged to have been stolen consisted of some twenty-seven articles of furniture. After the jury was impaneled and sworn in the first trial, the State presented as a witness one George Webber who testified that he worked at one time for Reynolds Bros., Inc., furniture manufacturer and alleged owner of the articles of furniture claimed by the State to have been stolen. He stated that while he was so employed he was approached by the respondent, with whom he had had previous business relations, who requested him to pick up some furniture or parts from the employer of the witness with the warning, "You be careful you don't get caught." He was to be paid three or four dollars for each article delivered to the respondent. He testified that over a period of two months he stole from his employer articles of furniture, including tops and spindles, which he turned over to the respondent. Over respondent's objection he identified the various articles of furniture marked for identification as exhibits numbered from one to twenty-six, inclusive, as being similar to articles of furniture which he stated he stole from Reynolds Bros., Inc. and sold to the respondent.

Ronello Reynolds and his brother Edward testified for the State. Ronello Reynolds, President of Reynolds Bros.,

Inc., over respondent's objection identified the various marked exhibits as having been manufactured by his company, some of which, however, were not stained or the finish material applied at the mill. He stated that he never disposed of any Class A 1 manufactured furniture that had not been completed with finish. He also testified that all of the market exhibits before assembly were composed of first grade pieces, and that there were no seconds or reject pieces among the exhibits; that he and his brother were the only persons authorized to sell manufactured articles from the factory, and that he never sold any of these articles, or similar articles, to the witness George Webber or to the respondent. He also testified that articles similar to the marked exhibits were missing from the inventories once a week; that they were there at night and gone in the morning and that there was no way to account for their disappearance. Against the objection of the respondent he was permitted to give evidence of the value of the various articles of furniture covered by the marked exhibits. Each brother testified that the company did not sell finished furniture to anyone at retail.

Edward Reynolds, Vice President and Plant Superintendent of the Reynolds Bros., Inc. testified over objection that exhibits one to twenty-six, inclusive, were manufactured by his company. He testified that the marked exhibits were all "firsts" and that he never sold any of the company's products to George Webber and that he did not sell any item similar to the marked exhibits to John B. Sanborn, but did at one time sell Sanborn a telephone bench which was a "poor second."

Pitt J. Smith testified over objection that he had purchased from the respondent the items of furniture identified by exhibits one to twenty-six. The exhibits were offered and admitted over respondent's objections. After the State had closed its case, it was permitted over respondent's

objection to reopen the case for the purpose of recalling Ronello and Edward Reynolds to correct certain phases of their testimony. Ronello Reynolds qualified his previous testimony by stating that it was a common practice of the company to sell furniture to employees at cost; that the practice was so common that he forgot to mention it. He stated that he did not sell any of the articles of furniture identified by the numbered exhibits, or similar articles, to the employee George Webber. Edward Reynolds qualified his previous testimony that he had sold no furniture to anyone in 1956 and testified that he had sold furniture to employees, but not to George Webber. Based upon this change in the testimony of the two witnesses the Court ordered a mistrial.

The record discloses that the mistrial was ordered by the court in view of the fact that exhibits one to twenty-six, together with a great deal of testimony concerning them, were admitted over the objection of the respondent, and would not have been admitted had the later testimony of Ronello and Edward Reynolds been given prior to the rulings by the court on the exhibits and the testimony relating to them. Counsel for the respondent objected to the mistrial order and stated that the respondent was willing to waive any right to a mistrial upon the express condition that the court rule out exhibits one to twenty-six and instruct the jury to completely disregard these exhibits *and all testimony relating thereto*. All of the testimony relating to the exhibits did not depend upon the final admission of the exhibits in evidence. There was sufficient admissible evidence in the case, if believed, to warrant a conviction. The task of instructing the jury on what testimony to consider and what not to consider was undoubtedly a difficult one. However, the court did not base his mistrial order upon the mere difficulty of giving proper instructions. He stated that he was convinced that the testi-

mony concerning the exhibits was so involved with all of the other testimony that the jury could not be expected to understand what they were to disregard and what they were to regard, and "that a fair trial could not take place if the case continued before that jury who had heard so much testimony which they should not have heard."

The law is well settled that jeopardy begins when a respondent is put upon trial before a court of competent jurisdiction, upon a sufficient indictment, after the jury has been impaneled and sworn. *State* v. *Slorah,* 118 Me. 203, 208, 106 A. 768. All of these elements necessary to the attachment of jeopardy were present.

Under the strict rules of common law the discharge of the jury after the attachment of jeopardy was equivalent to an acquittal. However, modern practice has brought about a relaxation of this strict rule to the extent that the court may now discharge a jury after it has been impaneled and sworn where manifest and urgent necessity calls for such action. The exercise of this power cannot be employed arbitrarily, but must be left to the sound legal discretion of the presiding justice, acting cautiously under his oath of office and having due regard to the rights of both the respondent and the State. This principle is expressed in 15 Am. Jur. Criminal Law, Sec. 406, p. 75, 76, as follows:

> "Under the strict practice which formerly prevailed, in England at least, the discharge of the jury in a criminal case for any cause after the proceedings had advanced to such a stage that jeopardy had attached, but before a verdict of acquittal or conviction, was held to sustain a plea of former jeopardy, and therefore, to operate practically as a discharge of the prisoner. In deference, however, to the necessities of justice, this strict rule has been greatly relaxed, and the general modern rule is that the court may discharge a jury without working an acquittal of the de-

fendant, in any case where the ends of justice, under the circumstances, would otherwise be defeated. The court is to exercise a sound discretion on the subject, and it is impossible to define all the circumstances which would render it proper for the court to interfere. The power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes; and in capital cases especially, courts should be extremely careful. The courts, however, undoubtedly have the right to order the discharge; and the security which the public has for the faithful, sound, and conscientious exercise of this discretion rests on the responsibility of the judges under their oaths of office. In order, however, to justify an exercise of this power, the occasion for it must be very cogent, or, as some courts have said, there must be an absolute or manifest necessity. The power to discharge cannot be arbitrarily exercised."

For a further discussion of the same principle see WHARTON'S CRIMINAL LAW, 12th Ed., Vol. 1, Sec. 395; 22 C. J. S., Criminal Law, Sec. 259.

Our own court in *State* v. *Slorah, supra,* has given careful consideration to the question of the right of the court to withdraw a criminal case from further consideration by the jury after jeopardy of the respondent has attached. We quote at length from this opinion as follows:

"Does the record disclose conditions creating what has been termed by the courts a manifest, urgent necessity, such as warranted the presiding Justice in withdrawing the case from the jury and discharging them from further consideration of it. We think it does.

Anciently it is claimed that a jury once sworn in a 'case of life or member' could not be discharged by the court, but must render a verdict. Coke Litt., 277. Whether ever enforced to its full limit, which as one case puts it would require 'the confinement of the jury till death, if they do not

agree,' *Winsor* v. *Queen,* 1 L. R., Q. B. C., 1865, page 394, is of no consequence. The rigor of and strict compliance with the technicalities of the common law in safeguarding the accused in criminal cases has been much relaxed since the decrease in the number of capital offenses. As early as the time of Blackstone, at least, an exception in this respect had been introduced in practice and it was recognized that juries in criminal cases might be discharged during the trial in cases of 'evident necessity.' Blackstone's Com., Vol. 4, page 361.

The expression 'evident necessity' has been expanded and defined in practice in the course of time as occasions have arisen until under certain conditions there is no longer any question of the right of the court to stop a trial even in a capital case, and withdraw the case from the further consideration of the jury. In attempting to define those conditions, as the court puts it in the case of *Winsor* v. *Queen, supra,* 'We cannot approach nearer to precision than by describing the degree (of need) as a high degree such as in the wider sense of the word might be denoted by necessity.'

Certain conditions, if arising in the trial of a case, have come to be well recognized as constituting that 'urgent necessity' which will warrant the discharge of a jury, and if they appear of record will bar a plea of former jeopardy: (1) the consent of the respondent, (2) illness of the court, a member of the jury, or the respondent, (3) the absenting from the trial of a member of the panel or of the respondent, (4) where the term of court is fixed in duration and ends before verdict, (5) where the jury cannot agree. . . .

It is not easy to state the principle so as to cover all conditions that may arise, and the above are only examples of the instances first gaining recognition by the courts and illustrative of the principle. It is now equally as well recognized that there are certain other conditions that create what have been termed a moral or legal necessity, as distinguished from physical necessity such as the

illness of the court or jury. *Nolan* v. *State,* 55 Ga., 521; *Andrews* v. *State,* 174 Ala., 11. . . .

Of the conditions, except as found in the decided cases, more cannot be said than that in all cases, capital or otherwise, they must be left to the sound legal discretion of the presiding Justice, acting under his oath of office, having due regard to the rights of both the accused and the State, and subject to review by this court . . . . Perhaps, the most comprehensive statement of the law is found in *United States* v. *Perez,* 9 Wheat., 579, by Justice Story, and adopted in *Thompson* v. *United States, supra*:

> 'Courts of justice are invested with the authority to discharge a jury from giving a verdict, whenever in their opinion taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of justice would otherwise be defeated.' . . .

To render a verdict void in civil cases it need not appear that the jury was actually prejudiced, biased, or influenced by the occurrence. If it may have affected their ability to render an impartial verdict, it is sufficient . . . . We think the same considerations should apply in criminal cases whether it might affect adversely the State or the respondent, *State* v. *Hascall,* 6 N. H., 352. Both are entitled to a fair trial."

In the *Slorah* case the court sets out certain conditions well recognized as constituting manifest or urgent necessity. Manifest and urgent necessity does not always arise from physical necessity. As stated in the *Slorah* case, it may arise from moral or legal necessity as distinguished from physical necessity. Our court does not attempt to define the exact conditions under which manifest necessity exists. They are left to the sound discretion of the presiding justice, acting under his oath of office, and subject to review by this court. Other courts have followed

the same practice, and have been reluctant to define the exact conditions under which such a necessity may exist.

It is clear that an arbitrary order of mistrial operates as an acquittal. According to the overwhelming weight of authority, the discharge of a jury on account of the inability of the prosecution to proceed with the trial in the absence of necessary witnesses or other evidence to prove the crime charged operates as an acquittal. See *Cornero* v. *United States*, 48 F. (2nd) 69, 74 A.L.R. 797; 74 A.L.R. 803 (annotation); 15 Am. Jur. Criminal Law, Sec. 409.

We have been unable to find a case in which the conditions facing the court at the time of mistrial were the same as in this case. However, the general statement of the law in *United States* v. *Perez*, as quoted in the *Slorah* case has met with approval in other and more recent cases.

In the case of *Thompson* v. *United States*, 155 U. S. 271, 273, 274, it came to the attention of the court that one of the jurors had been a member of the grand jury that returned the indictment. The court, without the consent of the defendant, and under exceptions, discharged the jury and directed that another jury should be called. Answering defendant's plea of former jeopardy the court said:

"As to the question raised by the plea of former jeopardy, it is sufficiently answered by citing *United States* v. *Perez*, 22 U. S. 9 Wheat. 579 6:165; *Simmons* v. *United States*, 142 U. S. 148 35: 968, and *Logan* v. *United States*, 144 U. S. 263 36: 429. Those cases clearly establish the law of this court, that courts of justice are invested with the authority to discharge a jury from giving any verdict, whenever in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated, and to order a trial by another jury; and that the defendant is

not thereby twice put in jeopardy within the meaning of the 5th Amendment to the Constitution of the United States."

In *Wade* v. *Hunter*, 336 U. S. 684, a soldier participating in the invasion of Germany was put on trial before a court-martial. After hearing the evidence and arguments the court-martial closed to consider the case. Later the court-martial reopened and announced a continuance in order to hear witnesses not then available. Subsequently, the Army's advance having so increased its distance from the residence of the witnesses that the case could not be completed within a reasonable time, the charges were withdrawn and transmitted to another military unit. Another court-martial was convened and a plea of former jeopardy was made by the prisoner. The court after quoting from the *Perez* case said:

"The rule announced in the Perez Case has been the basis for all later decision of this Court on double jeopardy. It attempts to lay down no rigid formula. Under the rule a trial can be discontinued when particular circumstances manifest a necessity for so doing, and when failure to discontinue would defeat the ends of justice. We see no reason why the same broad test should not be applied in deciding whether court-martial action runs counter to the Fifth Amendment's provision against double jeopardy. Measured by the Perez rule to which we adhere, petitioner's second court-martial trial was not the kind of double jeopardy within the intent of the Fifth Amendment."

"We are urged to apply the Cornero interpretation of the 'urgent necessity' rule here. We are asked to adopt the Cornero rule under which petitioner contends the absence of witnesses can never justify discontinuance of a trial. Such a rigid formula is inconsistent with the guiding principles of the Perez decision to which we adhere. Those principles command courts in considering whether

a trial should be terminated without judgment to take 'all circumstances into account' and thereby forbid the mechanical application of an abstract formula. The value of the Perez principles thus lies in their capacity for informed application under widely different circumstances without injury to defendants or to the public interest."

The *Perez* case, the *Thompson* case, and the case of *Wade* v. *Hunter,* were cited with approval in *United States* v. *Gori,* an appeal to the United States Court of Appeals, Second Circuit, based upon a plea of former jeopardy, reported in 282 F. (2nd) 43. At the former trial the Government during the examination of a witness ran into difficulty because of continuous formal objections by the defense and "interference on the part of the trial judge." The court, during the course of the testimony of this witness, declared a mistrial "because of the conduct of the district attorney." The court found that the prosecutor did nothing to instigate the declaration of mistrial. A majority of the court held that the prior trial did not support a plea for former jeopardy. On certiorari, the United States Supreme Court affirmed the decision of the Court of Appeals. *Gori* v. *United States* (1961)—U. S.—, 81 S. Ct. 1523, 6 L. ed. (2nd) 901. We quote the following extracts from the majority opinion in that case:

"Where, for reasons deemed compelling by the trial judge, who is best situated intelligently to make such a decision, the ends of substantial justice cannot be attained without discontinuing the trial, a mistrial may be declared without the defendant's consent and even over his objection, and he may be retried consistently with the Fifth Amendment. * * * * It is also clear that 'This Court has long favored the rule of discretion in the trial judge to declare a mistrial and to require another panel to try the defendant if the ends of justice will be best served. . . .,' * * * * and that we have consistently declined to scrutinize with sharp surveillance the exercise of that discretion."

In *Lovato* v. *New Mexico*, 242 U. S. 199, the accused had pleaded not guilty to an indictment for murder. Without withdrawing his plea, he demurred to the indictment. The demurrer was overruled and a jury was impaneled and sworn. It then appeared that the defendant had not been arraigned since the overruling of the demurrer. The court dismissed the jury and the respondent pleaded not guilty. The same jury was impaneled, and the case proceeded to trial. At the conclusion of the evidence for the prosecution, the defendant made a motion for a directed verdict on the ground of former jeopardy. The motion was denied, and a conviction for manslaughter followed. The same ground was relied upon in a motion in arrest of judgment which was denied, and an appeal was taken. The Supreme Court of New Mexico held that the question concerning double jeopardy was raised too late and affirmed the previous judgment. The U. S. Supreme Court, in affirming the judgment of the Supreme Court of New Mexico, withheld any opinion as to the correctness of the ruling of the court below concerning the failure to promptly raise the question of former jeopardy, but, citing the *Perez* case, found that the action taken by the trial judge was clearly within the bounds of sound judicial discretion.

In *People* v. *Thomas*, 15 Ill. (2nd) 344, 155 N. E. (2nd) 16 (1959), the court during the course of the trial, in the presence of the jury, instructed the jury to disregard a certain statement made by counsel for the respondent, and further remarked that the statement was "purely a manufactured and synthetic appeal."

After a conference, the court, on motion of the prosecution, declared a mistrial. The respondent was again tried and at the second trial his motion to dismiss on the ground of former jeopardy was denied. Upon conviction he brought a writ of error in which he contended that he had been twice put in jeopardy for the same offense. In affirming

the conviction the court found it unnecessary to determine the propriety of the mistrial on the assumption that it was granted to protect the prosecution from unfairness. The court found in the record another basis for the mistrial because the trial judge had made a serious charge that would almost inevitably have prejudiced the respondent in the eyes of the jury. Under such circumstances, the court stated, a verdict of guilty probably would have been set aside. The court then said:

> "The ends of justice can hardly be said to be served by requiring that a trial be continued to its conclusion after an inadvertent error by the trial judge has sharply minimized the possibility of sustaining a verdict for the prosecution. Cf. American Law Institute, Model Penal Code, Tent. Draft No. 5, sec. 1.09. Concepts of impartial justice and scrupulous fairness to a defendant do not include an opportunity to speculate upon the chance of a favorable verdict when, as in this case, a legal defect has substantially eliminated the chance of an unfavorable one."

The following quotation from the opinion indicates that the court considered the court below was justified in making the mistrial order by reason of manifest necessity:

> "The varying circumstances that will justify a mistrial without giving rise to double jeopardy have frequently been generalized in the expression that a court has authority to discharge a jury 'whenever in the court's opinion there is manifest necessity for such act or the ends of public justice would otherwise be defeated, * * *.' *People* v. *Touhy,* 361 Ill. 332, 344, 197 N. E. 849, 856; *People* v. *Simos,* 345 Ill. 226, 231, 178 N. E. 188, 190; *People* v. *Peplos,* 340 Ill. 27, 172 N. E. 54. These decisions hold that the ruling of the trial court is not subject to review in the absence of an abuse of discretion."

See also on the same principle *Brock* v. *North Carolina,* 344 U. S. 424; *Simmons* v. *United States,* 142 U. S.

148; *United States* v. *Cimino,* 224 F. (2nd) 274; *Scott* v. *United States,* 202 F. (2nd) 354.

It is not necessary that the respondent consent to a mistrial in order to obviate the constitutional bar. A mistrial may be properly ordered either on the motion of the prosecuting attorney or by the court of its own motion, and over the opposition of the respondent. *United States* v. *Gori, supra.*

The question here is the application of the rule laid down in the *Slorah* and *Perez* cases. I feel that the action of the presiding justice in declaring the mistrial was proper and justifiable under that rule. The basic issue in the instant case can be stated rather simply. Can the situation ever arise in which it would be completely unrealistic to expect a jury to heed an instruction to disregard certain evidence and put it out of mind in the course of their deliberations? If so, is this such a case? I would answer both questions in the affirmative. The court, in view of the evidence before him at the time, had admitted certain exhibits. The jury undoubtedly were under the impression that the exhibits were offered and admitted as tending to prove that they were the identical articles alleged to have been unlawfully received by the respondent. The qualification of certain previous testimony relating thereto, rendered the exhibits and some of the testimony inadmissible for such purpose. There was, however, ample admissible evidence in the case, if believed, without the exhibits, to justify a conviction for the crime charged. Not all of the evidence relating to the exhibits was inadmissible. Evidence concerning the exhibits was admissible for the purpose of proving value, without the actual admission of the exhibits in evidence. See *Berney* v. *Dinsmore,* 141 Mass. 42, 5 N. E. 273, 55 Am. Rep. 445. Also, testimony relating to the exhibits was admissible for the purpose of assisting the jury in determining whether the description

of the property alleged to have been stolen and unlawfully received conformed with the description set forth in the indictment.

The presiding justice concluded, in my view correctly, that the evidence to be disregarded was so voluminous and so interwoven into the entire fabric of the case that it would be virtually impossible for any group of twelve citizens, untrained in the law, to sort out of a considerable body of evidence so much that under changed conditions must be eliminated from consideration. Justice is not furthered by a verdict which is the product of utter confusion in the minds of the jury. In the ordinary case evidence to be subtracted out of consideration is relatively isolated and easily separable. In such a case the assumption that the jury can heed an instruction to disregard is valid. But human capacity would seem to impose some reasonable limits on such an assumption.

The justice below was presented with a choice between two alternatives. He could, as the respondent requested, give the instruction to disregard the evidence. Was the decision to be his or the respondent's? I suppose no one would suggest that by imposing as a condition of his waiver of his right to a mistrial the giving of an erroneous instruction as to the law, the respondent could thereby compel the giving of such an instruction. No more could the respondent, in my view, compel the giving of an instruction which the presiding justice, in the exercise of a sound discretion and for good reason, deemed to be hopelessly confusing and meaningless. If, on the other hand, he refused to give the requested instruction, the order of a mistrial was left as the only available means of protecting the respondent from the consequence of an unfair verdict. The danger to the respondent which only the presiding justice seems fully to have apprehended lay in the fact that there was ample evidence in the case entirely apart from the evi-

dence to be disregarded to warrant a conviction. If trial of the case had continued and a verdict of guilty rendered, it could never have been known whether that verdict rested solely on legal evidence or resulted wholly or in part from the inability of the jury to immunize themselves from the influence of a substantial volume of evidence which they were suddenly instructed to disregard. The court was in a position, by the exercise of a sound discretion, to determine what decision ought to be made in the interest of justice in the troublesome situation that had arisen in the course of the trial. His statement explaining his action and giving his reasons therefor plainly indicates his concern that the jury, in the event that instructions were given, might not understand what testimony to regard and what to disregard. He also expressed misgivings that a fair trial could take place before the jury which had heard so much testimony that had become inadmissible. The court obviously felt that the ends of justice would be defeated if trial of the case continued. His action was not an arbitrary one. I see in the election of the justice below to order a mistrial no more than the exercise of a sound discretion, on which no valid claim of double jeopardy can be found. *Gori* v. *United States* (1961) — U. S. —. 81 S. Ct. 1523, *supra.*

The exceptions should be overruled.

Mr. Justice Webber concurs in this opinion.